[Crim. No. 3349. Third Dist. Nov. 19, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. FRANK BANOS, Defendant and Appellant.

Dennis R. Scott, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, Raymond M. Momboisse and Edward A. Hinz, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, J.—Defendant was convicted by a jury on a grand jury indictment of lewd and lascivious acts in violation of Penal Code section 288. Contentions on appeal (also made on a denied motion for new trial) are that there was error in: (1) the admission of certain evidence relating to defendant's conduct, (2) the receiving in evidence of defendant's extrajudicial admission said to have been induced by coercion, and (3) the refusal of certain instructions.

Defendant is 31 years old. The alleged victim is his niece, 5 years of age at the time of the acts charged, 6 years at the time of the trial. The case of the prosecution was based primarily upon the testimony of the child. Defendant did not, and does not, challenge her qualification as a witness. Ordinarily, testimony of a child of such tender years would be received with skepticism. Our careful reading of the transcript, however, has convinced us: That the child's story was trustworthy; that corroborating circumstances, including defendant's own admissions and conduct, point to doubtless guilt; that defendant received a fair trial; and that the record is free from prejudicial error.

The trial judge, before the child was permitted to testify, conducted a thorough and searching *voir dire* examination, followed by questioning by defendant's counsel. These examinations convinced the trial court, and satisfy us, that the child was qualified under Code of Civil Procedure, section 1879 and section 1880, subdivision 2; that she possessed intelligence, understanding and ability sufficient to receive and accurately recount her impressions; that she understood the nature of an oath and had ''a moral sensibility to realize that [she] should tell the truth'' with also a realization that

punishment would follow the telling of a falsehood. (*People v. Burton*, 55 Cal.2d 328, 341 [11 Cal.Rptr. 65, 359 P.2d 433].)

The act charged in the indictment occurred at dawn on the morning of November 1, 1961. Both defendant and the alleged victim lived in the modest, perhaps substandard and certainly overcrowded, home of R. C_____, grandmother of the child R_____, and mother of the defendant. Other occupants of the house were a 16 year old stepbrother, and an older sister of the victim. The oldest sister occupied one of two bedrooms at the house, the grandmother and the victim occupied the other. The stepbrother slept on a couch in the living room. Defendant slept, under blankets, on the living room floor.

Early on the morning in question, the child, R_____, got up to go to the bathroom. She had on a dress and panties, no shoes. As she walked across the living room, defendant, according to the child's story, beckoned to her and when she went over to where he was lying on the floor he took her beneath the covers and there committed the acts which are charged in the indictment. Since no contention is made of insufficiency of the evidence to support the verdict, it is unnecessary for us to detail these acts. They were, of course, described by the victim in childish language, but the description was graphic. Defendant then ordered the child not to tell of the incident and she returned to her bedroom. The grandmother did not awaken; neither did the other members of the household and the acts were unwitnessed.

 Immediately after the date of the above incident, the grandmother became hospitalized and the child went to live with other relatives. Both returned about a week later. On November 8, 1961, the grandmother noticed yellow spots on the child's panties made by what was thereafter found to be a vaginal discharge. This incident was the basis of questioning by the grandmother during which the child made the complaints against defendant out of which the prosecution arose.

On November 13, 1961, the grandmother took the child to a Dr. Trent, who examined her and found that there were abrasions in the crotch involving the vaginal area and that the discharges had resulted from a vaginitis. Unable to diagnose the source of the latter inflammation, but being of the opinion that the cause might possibly be venereal, the doctor asked that any male members of the household be brought in for examination. The grandmother then went home and

directed both the defendant and the 16 year old stepbrother of defendant to go to the doctor for examination.

In her conversation with her son, the grandmother said (as translated by a Mexican interpreter) : "Son, tell me the truth because you and D_____ [the stepson] are here, and I can't do anything until I know the truth. Tell me, frankly, tell me what you did with the child because you are my son just as R_____ is my daughter[1] and I love you both." Thus questioned, defendant commenced to cry and told his mother: "Mother, the child came over and molested me." He was then admonished that R_____ being a small child "doesn't know anything about those things" and, being small "she is not culpable." Defendant then "just shrugged his shoulders and started to cry." The grandmother testified later, "[h]e just remained silent and his eyes turned red."

The next day, defendant, instead of going to see the doctor, left the house early. He was asked twice to go but never went.

Defendant urges that none of the testimony of the grandmother was "germane to the issue," and that the testimony of Dr. Trent, which included information that vaginitis was sometimes venereal in origin, was prejudicial because it permitted the jury to speculate that defendant had given the child a venereal disease. The testimony of the grandmother, however, served first of all to explain the child's delay in making the complaint (a factor material to the case of the prosecution which in a Pen. Code, § 288 charge is permitted to, and should, show that the victim complained promptly or after excusable delay). (*People* v. *Burton, supra,* 55 Cal.2d 238; *People* v. *Staggs,* 180 Cal.App.2d 578, 580 [4 Cal.Rptr. 587].) Her testimony also was relevant and admissible to show defendant's behavior indicating a consciousness of guilt.

If a person is accused of having committed a crime under circumstances which fairly afford him an opportunity to reply, his silence or equivocal conduct may be offered as an exception to the hearsay exclusion. (This rule, with its limitations, has been expressed frequently by our Supreme Court, see *People* v. *Simmons,* 28 Cal.2d 699, 713 [172 P.2d 18]; *People* v. *Davis,* 43 Cal.2d 661, 669-672 [276 P.2d 801]; *People* v. *Burton,* 55 Cal.2d 328, 347 [11 Cal.Rptr. 65, 359

[1]Although the child was her grandchild, the grandmother had served for years as her foster mother and the child believed her to be her actual mother.

P.2d 433], and most recently in *People* v. *Briggs,* 58 Cal.2d 385, 408-409 [24 Cal.Rptr. 417, 374 P.2d 257] ; and by this court in *People* v. *Bracamonte,* 197 Cal.App.2d 385, 388-390 [17 Cal.Rptr. 62]. See also 2 Wigmore, Evidence, 3d ed., § 273, p. 106.) Here defendant's conduct, upon being questioned by his mother and before he had been taken into custody, was significant. Even more revealing was his statement: "Mother, the child came over and molested me," since it seems to admit the act while accusing the 5-year-old child as the aggressor— an immaterial (*People* v. *Piccionelli,* 175 Cal.App.2d 391, 393 [346 P.2d 542] unlikelihood.

■ The supplementing testimony of Dr. Trent was admissible, although its probative value may not have been great. His finding of abrasions in the child's crotch had some relevancy on whether there had been some violation of the child's body in this area, even though on cross-examination defendant's attorney was able to elicit the doctor's opinion that the abrasions had occurred within five or six days of the date of his examination (November 13th). The doctor's testimony that the vaginitis was of possible venereal origin had for its patent purpose the explanation of why the grandmother sought to have the defendant go to the doctor for examination. We do not see in it the ulterior motive now urged by defendant on appeal: that it was designed to cause the jury to speculate that defendant had, in fact, given the child a venereal disease. As a matter of fact, most of the testimony anent the possibility of venereal infection was brought out (and this so frequently happens) as the result of cross-examination. Moreover, we feel disinclined to strain to search latently for a sinister purpose in the offer of Dr. Trent's testimony or to assume that the jury would pause to speculate as to additional miscreancy, when the acts charged and proved, without embellishment, were so repugnant and antisocial ipso facto.

■ The doctor's testimony was admitted without objection which cannot now be raised on appeal. (*People* v. *Feldkamp,* 51 Cal.2d 237, 241 [331 P.2d 632] ; *People* v. *Odom,* 72 Cal. App.2d 72, 74 [164 P.2d 68].)

■ The next contention on appeal relates to the admission of defendant's extrajudicial statements made to police officers after he had been taken into custody. It is urged that such statements were coerced, the claimed vehicle of coercion being suggestions that defendant should submit to a lie detector test.

Officer Rodriguez, a prosecution witness, testified that he questioned the defendant in Spanish, under the direction of

another officer (Kemper) about the child's complaint against him, and that defendant's answers were free and voluntary. On this occasion defendant told three separate stories: First, that he had not seen the child go to the bathroom, but that he remembered being awakened one night when the child stepped over him; secondly, that one night he awakened and had had a nocturnal emission, after which he had reached for the child's panties on a chair and used them as a towel, mistaking them for his own (under) pants; the third story was that "one morning about 4:00 o'clock he was awakened and that she [the child] was laying next to him," and she then —and after he had awakened—seduced him, overcoming his efforts to withstand her blandishments.

The officer's testimony before the jury was preceded by a *voir dire* examination conducted before the court in the jury's absence. On *voir dire*, testimony substantially the same as above was given except that in stating the defendant's stories there, Rodriguez included suggestions by himself that defendant submit to a lie detector test. Defendant did not understand the nature of such a test and thought that physical pain would be occasioned thereby. He was told by the officer, several times, that no physical reaction was connected with the experience, and that if he told the truth no other harmful consequence would result. Defendant was not reassured, and no test was ever given.

The trial court was convinced that suggestions by the officer that defendant take the test were merely coincidental to the interview, and that the incriminating statements were given voluntarily and without coercion. On the face of the record and from the uncontradicted evidence of the police officer this conclusion is inescapable. The trial judge himself conducted a painstaking *voir dire* examination eliciting that at no time was it intimated to defendant that he was required to submit to a lie detector test. It was never held "over his head, so to speak to get him to talk." He was merely asked if he would "consent to take a lie detector test"—that and nothing more. Defendant did not elect to testify in his own defense and Officer Rodriguez' account of the inquiry was unchallenged.

The court, however, mindful of the rule which forbids the bringing before the jury by the prosecution either of the results of a lie detector test or the unwillingness of the defendant to take one, correctly instructed the prosecution that the witness Rodriguez in restating the incidents of the inquiry

in the jury's presence must omit any mention of the suggested test. (*People* v. *Carter*, 48 Cal.2d 737, 752 [312 P.2d 665], and cases there cited.)

No error is now, and none could be, urged as to this ruling. But the court, recognizing that the question of coercion was one of fact for the jury, also advised defense counsel that he could, if he chose to do so, pursue the matter before the jury, and could himself cross-examine regarding the lie detector test. The court, however, then ruled that said attorney *must make the decision then and there* so that the witness, omitting reference to the test, would not be placed in the equivocal position of having voluntarily left out a part of the incident, should defense counsel later decide to open up the matter on cross-examination. Defense counsel, reserving objection, announced he would not cross-examine regarding the lie detector test; he did not do so; and it was not mentioned by the witness on direct examination. The court's latter ruling is now urged as error. No authority is cited and because of the somewhat unusual circumstances here presented this does not produce astonishment. It is stated in McCormick on Evidence (§ 19, p. 42, Cross-Examination) :

"The infringement of the right of cross-examination . . . may come, not from the refusal or inability of the witness, but from the action of the judge. The judge . . . has wide discretionary control over the *extent* of cross-examination upon particular topics, but the denial of cross-examinations altogether, or its arbitrary curtailment, upon a proper subject of cross-examination will be ground for reversal if the ruling appears to have been substantially harmful."

In our opinion the ruling of the learned trial judge in putting defendant's attorney to an election regarding his cross-examination before the direct testimony of the witness had been given *before the jury* was questionable, even under the peculiar circumstances of this case. And had the question of coercion of this defendant been a close one a holding of prejudicial error might be justified. Such decision does not confront us. Here, the error, if any, was harmless. This witness' testimony had already been taken fully *before the court;* defendant, through able counsel, had already had a full opportunity to probe this testimony fully and his right of cross-examination had not only been uncurtailed, it had been supplemented by a searching *voir dire* examination by the court. The record, as stated above, shows the admissions made by defendant were unrelated to suggestions regarding the lie detector test, the

latter being merely coincidental thereto. There has been no miscarriage of justice. (Cal. Const., art. VI, § 4½.)

Defendant's admissions, moreover, were again uttered and elaborated on in another interview participated in by a deputy district attorney, interpreted by a professional interpreter, reported by a competent court reporter and transcribed. During this latter interview (made four days after the first one) no reference to a lie detector test was made. During this interview defendant repeated substantially the same story (the third version) as that told before, adding that as a result of R————————'s aggressive acts after he awakened and found her lying beside him he had had an emission.

We turn now to consider the error urged in the court's refusal of instructions.

Defendant contends he was entitled to go to the jury on the question of whether or not he was conscious when (and if) he committed the acts charged and that the court should have given an offered instruction on the effect of unconsciousness to negate guilt. This contention may be summarily disposed of. There is no evidence in the record which could lead a jury of reasonable men and women to the conclusion that defendant *was* unconscious. Conceding that defendant's stories (as his counsel on appeal affirms) were vague and inconsistent, still the only one of them which placed him in any contact whatever with the victim was that in which the seduction of this 31-year-old male by a 5-year-old child is said to have occurred after he had awakened to find her lying beside him and while he was slapping her and trying "to push her away from him." The court, moreover, did instruct the jury fully on the necessity of union of act and intent and that the act must be accompanied by a specific intent. "Criminal intent" was defined.

Defendant also offered an instruction as follows: "The defendant is not only entitled to depend upon evidence which he may have offered on his own behalf, but he is entitled to the benefit of any and all evidence or lack of evidence tending in any way to show his innocence, which may have been offered by the prosecution, if there is any such evidence."

The court refused this instruction because the defendant had neither testified nor offered any evidence on his behalf and defendant concedes that the first part of the instruction was inapplicable. Defendant insists, however, that it was the court's obligation to delete the inapplicable portion of the instruction and to give the rest. But the court had covered

cautionary warnings to the jury necessary to protect an accused comprehensively, and, we think, adequately. It had instructed that the failure of a defendant to deny or explain evidence did not create a presumption, or warrant an inference, of guilt, nor relieve the prosecution of its burden of proving every essential element of the crime to a moral certainty and beyond reasonable doubt (which burden was reasserted in several instructions). The jury was instructed that it must make an "entire comparison and consideration of all the evidence"; that it could not convict the defendant upon mere suspicion and that defendant did not have the burden of proving his innocence.

Assuming that the latter part of the instruction offered by defendant could properly have been given, it must be said again that there was here no miscarriage of justice (Cal. Const., art. VI, § 4½); particularly when the omission is considered in the light of the instructions actually given and the overwhelming evidence of guilt.

The judgment and the order are affirmed.

Peek, P. J., and Schottky, J., concurred.

A petition for a rehearing was denied December 10, 1962.