[Crim. No. 21855. First Dist., Div. One. Mar. 1, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND RANDLE, JR., Defendant and Appellant.

[Crim. No. 23356. First Dist., Div. One. Mar. 1, 1982.]

In re RAYMOND RANDLE, JR., on Habeas Corpus.

288

COUNSEL

Ephraim Margolin and William S. Mount for Defendant and Appellant and Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney Gen-

eral, W. Eric Collins and David D. Salmon, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LEVINS, J.*—Appellant was charged by information filed May 20, 1980, with assault by means of force likely to produce great bodily harm, assault with intent to commit rape, and forcible oral copulation (Pen. Code, §§ 245, subd. (a), 220, 288a, subd. (c)), allegedly committed against "Susan" on or about March 7, 1980. He was arraigned and pled not guilty to each count on May 27, 1980.

Jury trial was held July 18-29, 1980, and on July 28, 1980, the jury returned a verdict of guilty of forcible oral copulation but a mistrial was declared on July 29, 1980, respecting the other two counts, when the jury could not agree. A motion for a new trial was denied September 17, 1980, and appellant was sentenced on September 18, 1980, to a term of three years in state prison. Appellant was released on bail pending appeal and has filed a petition for the issuance of a writ of habeas corpus herewith.

Susan, a 21-year-old unemployed white woman temporarily without a residence, arrived from Mountain View by train Thursday, March 6, 1980, with two suitcases in hand and approximately $20. She intended to stay for several days with a friend but since that friend would not be home until late that night, she went to One Embarcadero Center to pass the time, leaving her suitcases under a stairwell. In the "Upper Level" discotheque and drinking establishment, she had two drinks, made a telephone call to see if her friend was home, met appellant and they talked and danced for a while. She had her third drink and went downstairs to make a phone call. Appellant followed her and they talked at some tables situated near the pay phones. He asked her to go home with him but she declined. She made the phone call and on hanging up, she testified, she was grabbed from behind and forced into the nearby men's restroom. She struggled and screamed, whereupon appellant began to choke her around the neck. She was then pushed down on the toilet seat and forced to orally copulate her assailant until he reached a climax. Someone came into the restroom while they were still

---

*Assigned by the Chairperson of the Judicial Council.

in the stall but she told appellant she wouldn't say anything. They exited the men's room and returned to the telephone where she retrieved her purse. Appellant removed a $10 bill from her purse and put in a $20 dollar bill. They returned to the bar upstairs and when appellant "left right away," she told Ms. Clements (or Clemons), a waitress, she had been assaulted in the men's room. Mr. Harrington, the bartender, phoned the police and she was examined at central emergency after telling the responding police officer what had happened.

The next day seven black and white photographs of Susan were taken by the police and, approximately four days later, two additional police photographs were taken purporting to show the injuries she received in her struggle with appellant.

The investigating officer testified that he arrived on March 7, 1980, between 1 a.m. and 2 a.m., spoke to Susan and saw a scar on her chin and on her right hand and her neck appeared to be somewhat puffy but that he observed no discoloration.

"Adrienne" testified that she encountered Susan at the upper level bar and Susan told her she had been attacked, that the attacker had "slapped" and "attempted to choke her" and "beat her against the wall. She was screaming and crying and [appellant] shoved her into a stall.... [S]omeone else" entered "but she was afraid to make a sound ...." This witness noticed a scrape under Susan's chin but saw nothing remarkable about her throat and lips.

Dr. McDaniel testified that he examined Susan at the emergency room, noted hematomas on her neck and that she reported pain in her back. She appeared to be anxious, apprehensive, uneasy, and excited, and he prescribed a Valium. She was menstruating at the time.

The police inspector assigned to the case testified that he saw all the injuries to Susan depicted in the photographs taken on March 7 and that they all appeared to be of recent origin.

Appellant, a black Berkeley beat patrolman with seven years' experience, agreed that an act of oral copulation had occurred between himself and Susan, but denied that it had been forcible. He said that he met Susan in the bar, talked to her for about 15 minutes and she told him she had been kidnaped a day or two before. He went downstairs to

the restroom and when he came out she was at the telephone. She first asked to go home with him but he said he had another engagement. She then said her money situation was bad and she offered sex for money. She took him into the men's room stall for privacy. There was no force used, no choking and no screaming. When he and Susan left the men's room, his friend and fellow Berkeley Police Officer Berry and another man were present. Afterwards she wanted $6. He gave her a $20 bill and she returned a $10 bill to him.

Officer Berry, a black male, testified that he had been with the police department for eight years and that he and appellant went to the upper level bar. Appellant sat next to Susan for 15 minutes and the two then went downstairs together. He went downstairs later, entered the men's room, heard no struggle, saw Susan and appellant leave the stall and the men's room. Another black man also was in the men's room, later identified as Michael Williams. Witness Berry returned upstairs, found appellant and they stayed another 15-30 minutes before leaving.

Michael Williams testified he had seen a woman following a man into the men's room and since he was curious, he went inside to see what was occurring. He heard them whispering but heard no sounds of struggle — no coercion, no screaming. He could not identify appellant but did identify Susan.

A cocktail waitress, Ms. Vail, testified that she recognized Susan from three or four previous times. On this occasion, she observed Susan's wound on her chin. It was a scab, completely dried up, and Susan said it was not from this incident.

### Issues on Appeal

I. The trial court erred in refusing to grant appellant's motion for a new trial on the ground of newly discovered evidence.

II. The prosecution committed *Wheeler* error by systematically and peremptorily excluding from the petit jury all potential jurors who were black.

III. The trial court committed additional evidentiary errors by:

A. Improper exclusion of evidence of prior conduct of complainant;

B. Refusal to grant new trial on ground of excusable defense inability to present testimony of material witness; and

C. Exclusion of prior recorded testimony of defense witnesses unavailable to testify at trial.

### DISCUSSION OF THOSE ISSUES

As established by the record following verdict, defense counsel learned that a John Ross read a newspaper account of appellant's trial and conviction which identified the complainant by name and that Mr. Ross had telephoned the Berkeley Police Department with information concerning complainant's habits and reputation in Burlingame. The defense sent an investigator to develop information concerning the complainant and as a result, 20 declarations from persons in the Burlingame area familiar with her were filed in support of appellant's motion for a new trial. Those declarations are divided into three evidentiary categories: (1) Complainant's reputation for and instances of soliciting public sex acts in exchange for money, drugs, and drinks; (2) complainant's accounts of the March 6 incident which contradicted her testimony at trial; and (3) complainant's reputation for dishonesty and theft, including specific instances thereof.

### I

The grant or denial of a motion for a new trial on the ground of newly discovered evidence is a matter which lies within the sound discretion of the trial court. (*People* v. *Hill* (1969) 70 Cal.2d 678, 698 [76 Cal.Rptr. 225, 452 P.2d 329] [cert. den. 406 U.S. 971 (32 L.Ed.2d 671, 92 S.Ct. 2416)].) In determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background. (*People* v. *Williams* (1962) 57 Cal.2d 263, 270 [18 Cal.Rptr. 729, 368 P.2d 353].) In ruling on the motion, the trial court should consider these relevant factors: (1) that the evidence, and not merely its materiality, is newly discovered; (2) that the evidence is not merely cumulative; (3) that it would render a different result probable on a retrial of the cause; (4) that the party could not with reasonable diligence have discovered and produced it at trial; and (5) that these facts have been shown by the best evidence of which the case admits. (*People* v. *Hairgrove* (1971) 18 Cal.App.3d 606, 610 [96 Cal.Rptr. 142].)

The evidence, and not merely its materiality, was newly discovered. The evidence was unearthed following the conclusion of the trial and was newly discovered within the meaning of Penal Code section 1181, subdivision 8. The "diligence" of defendant in marshalling his evidence must be determined in light of the peculiar circumstances involved. (*People* v. *Goodwin* (1927) 202 Cal. 527, 538 [261 P. 1009].) Here, the defense had no inkling of Susan's connection with Burlingame until after trial and verdict. The newspaper account gave her name and John Ross gave the Berkeley Police Department information concerning her background and reputation in Burlingame. The patently adventitious and contingent manner in which the newly discovered evidence fell into the hands of the defense establishes the requisite diligence within that imposed by the relevant case law. (See *People* v. *Huskins* (1966) 245 Cal.App.2d 859, 861 [54 Cal.Rptr. 253], *People* v. *Williams, supra*, 57 Cal.2d 263, 274; *People* v. *Henry* (1956) 142 Cal.App.2d 114, 121, 122 [298 P.2d 80].) "[I]t has been said that one of the most prolific causes of miscarriages of justice is the reluctance of trial judges to exercise the discretion with which they are clothed to grant a new trial when the circumstances show that justice would be thereby served." (*People* v. *Love* (1959) 51 Cal.2d 751, 758 [336 P.2d 169].)

The newly discovered evidence would render a different result probable on retrial of this case. The core of the disagreement is whether the sex act occurred with consent or force. The victim told her story and the appellant told his. The new evidence does more than merely impeach Susan—it tends to destroy her testimony by raising grave doubts about her veracity and credibility. Her credibility is central to the proof of the crime. (*People* v. *Huskins, supra*, 245 Cal.App.2d 859, 863.)

The 20 declarations were made by 17 different individuals in the Burlingame area, men and women with a variety of occupations but with one thing in common: they knew the complainant's reputation. Their declarations detailed specific instances of public drunkenness, dishonesty, and public sex acts by Susan and undermined her credibility. The exclusion of the evidence bearing on the credibility of a prosecution witness where only the witness and defendant are percipient witnesses has been held to be prejudicial error. (*People* v. *Rowland* (1968) 262 Cal.App.2d 790, 798 [69 Cal.Rptr. 269]; *People* v. *Mizer* (1961) 195 Cal.App.2d 261, 269 [15 Cal.Rptr. 272].)

This evidence is not merely cumulative and has been shown by the best evidence of which the case admits. During the trial the defense

made no substantial effort to impeach Susan on the basis of her background since it had no information which would have warranted such a course. The newly discovered evidence is by sworn declarations and shows Susan's reputation for untruthfulness. That reputation together with evidence of specific conduct of that nature is admissible on retrial. The Attorney General so concedes. The evidence of her reputation for theft, which includes specific instances thereof, might be admissible on retiral as being probative of dishonesty and lack of credibility but dissimilar to conduct in issue. Therefore, although a trial court might limit it or exclude it under Evidence Code section 352, the evidence of her lack of chastity and of soliciting drinks or money for sexual acts goes to the issue of credibility. The Attorney General concedes, "The credibility of the witnesses is critical to this case. The cold record is too finely balanced, too contradictory, too full of both impeachment and corroboration. Even the additional matters raised on motion for new trial, or which should be considered in any retrial, do not resolve the dilemma, for they simply impeach both defendant and accuser."

Further, the Burlingame evidence impeaches evidence that Susan was injured that night and it certainly impeaches the evidence concerning her truth and veracity. That newly discovered evidence is crucial to solving the question of her credibility. Evidence Code section 1103, subdivision (b)(1), as amended, shows that "opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of such evidence, is not admissible by the defendant in order to prove consent by the complaining witness." However, Evidence Code section 1103, subdivision (b)(4), states that "Nothing in this subdivision shall be construed to make inadmissible any evidence offered to attack the credibility of the complaining witness as provided in Section 782." Section 782 provides the procedure to be used for the offer of proof to attack such credibility and for the ruling thereon. The denial of the motion for a new trial on the ground of newly discovered evidence was error.

## II

■ Concerning the *Wheeler* issue, "If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, as in the case at bar, he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons

excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 280 [148 Cal.Rptr. 890, 583 P.2d 748], fn. omitted; see also *Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 97, 98 [154 Cal.Rptr. 734, 593 P.2d 595]; *People* v. *Allen* (1979) 23 Cal.3d 286, 293 [152 Cal.Rptr. 454, 590 P.2d 30].) Here, the record establishes that the prosecutor systematically excluded all black members of the venire by use of his peremptories and used a disproportionate number of his peremptories against the group. Upon prima facie showing of group bias in the selection, the burden then shifted to the prosecutor to show that the peremptory challenges in question were not predicated on group bias alone. (See *Wheeler, supra*, 22 Cal.3d at p. 281.) *Wheeler* does not forbid the use of peremptory challenges to eliminate members of cognizable groups for reasons other than their membership in the cognizable group. (See *Rubio, supra*, 24 Cal.3d pp. 96-100; *People* v. *Estrada* (1979) 93 Cal. App.3d 76, 89-96 [155 Cal.Rptr. 731].) So long as a peremptory challenge is exercised for some reason other than a wish to exclude members of a cognizable group, the jury remains constitutionally "representative" and no defect exists which *Wheeler* would proscribe. (*Rubio, supra*, 24 Cal.3d pp. 99-100; *Estrada, supra*, 93 Cal.App.3d pp. 93-96.) The *Wheeler* court recognized that "difficult and often close judgments" may sometimes be necessary, but it expressed ability in trial judges, familiar with local conditions and counsel, to distinguish the true case of discrimination from the spurious claim of it. (See also *People* v. *Williams* (1981) 29 Cal.3d 392, 405 [174 Cal.Rptr. 317, 628 P.2d 869].)

The prosecutor herein explained his peremptory challenges for reasons other than group bias, sustained his burden of justification, and the trial court ruled that no systematic exclusion of blacks had occurred. Then, it denied the motion and therefore we will not reject the trial court's assessment.

## III

A. The trial court committed error in excluding testimony that on two prior occasions at the same bar restaurant Susan had falsely complained of being a victim of purse snatch and of having been kidnaped. Evidence Code section 1103, subdivision (a)(1), authorizes the

admission of evidence of the alleged victim's character or trait of character—including evidence of specific acts—if offered by the defendant to show prior conduct of the victim in conformity with such character or trait of character. (See *In re Ferguson* (1971) 5 Cal.3d 525, 533 [96 Cal.Rptr. 594, 487 P.2d 1234]; *People* v. *Covino* (1980) 100 Cal. App.3d 660, 666 [161 Cal.Rptr. 155].)

B. ■ The trial court did not abuse its discretion in denying appellant's motion for new trial based on the asserted neglect of his counsel in subpoenaing a defense witness. The witness was subpoenaed for July 23, 1980, and she informed counsel on July 25, 1980, that he "knew where to reach her. . . ." Counsel did nothing to invite her to appear or to again subpoena her. The defense was deprived of the witness' testimony through fault of his own and it cannot be said that defendant was denied a fair trial therefor. (*People* v. *Daivs* (1973) 31 Cal.App.3d 106, 109-110 [106 Cal.Rptr. 897].)

C. ■ The prior recorded preliminary examination testimony of two defense witnesses unavailable to testify at trial—Harrington, the bartender, and Clements, a cocktail waitres—who were in Colorado and New York respectively—concerning the fact that Susan never complained of injuries after the incident, should have been admitted at trial. Defense counsel sought leave to have said testimony by way of transcripts admitted and after examination in chambers, the trial court declined to permit admission "on the basis of diligency." Evidence Code section 240, subdivision (a)(4), provides that a declarant is "unavailable as a witness" if absent from the hearing and the court is unable to compel his attendance by its process. This subject of "diligency" merits attention since it relates to a matter which might arise on retrial. There is a wide disparity between the ability of the prosecution, with unlimited funds, police, and its own investigators, to locate and subpoena a witness and that of a defendant who must rely on his attorney who usually cannot expect compensation for his efforts. The trial court may take this into consideration in assessing whether a defendant has exercised due diligence to secure the attendance of an absent witness upon retrial hereof. (See *People* v. *Linder* (1971) 5 Cal.3d 342, 348 [96 Cal.Rptr. 26, 486 P.2d 1226]; Jefferson, Cal. Evidence Benchbook (1972 ed.) § 2.6, p. 46.)

■ ■ This is peculiarly a credibility case. The evidence excluded by the trial court and the newly discoverd evidence obtained between the jury verdict and the motion for new trial mandate a reversal. It

must be concluded under the very unusual facts of this case that it was an abuse of discretion for the trial court not to have granted defendant's motion for a new trial. It has been shown that a different result will probably occur at trial.

The judgment is reversed and as a consequence, the petition for the issuance of a writ of habeas corpus becomes moot and is dismissed.

Elkington, Acting P. J., and Newsom, J., concurred.