Filed 6/12/14  P. v. King CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>THEODORE FRANKLIN KING,<br><br>Defendant and Appellant. | A136816<br><br>(City & County of San Francisco Super. Ct. No. 217598) |

Defendant Theodore Franklin King appeals from a judgment convicting him of assault with a deadly weapon not a firearm (Pen. Code, § 245, subd. (a)(1)),[1] true findings of two prior serious felonies, and a sentence of 35 years to life imprisonment. On appeal he challenges the trial court's denial of his new trial motion based on newly discovered evidence and the denial of his motion to strike prior convictions in the interest of justice. Although there was a plausible basis for the new trial motion, we cannot say that the trial court abused its broad discretion in determining that the new evidence was not likely to have produced a different outcome, nor that it erred in denying the *Romero*[2] motion. We shall therefore affirm the judgment.

---

[1] All statutory references are to the Penal Code unless otherwise noted.

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

1

**Background**

*The evidence at trial*

Defendant's conviction arises out of a rather bizarre series of events that occurred at the Embarcadero BART station in San Francisco at around 8:00 p.m. on October 14, 2011. There is no dispute as to what occurred in the BART station. We shall therefore summarize those facts as they are presented in defendant's appellate brief (omitting record citations).

The victim, Frank Vinculado and his girlfriend Brittany O'Neil "were standing on the platform, waiting for the train. Vinculado was giving directions to someone, when [defendant] approached Vinculado and started talking to him at random about nonsense. [Defendant] had been seen walking in circles, or pacing around the station, yelling. O'Neil said he looked kind of crazy, his eyes were wide open. [Defendant] seemed angry, or irritated with Vinculado, and was acting aggressively towards him.

"[Defendant] got right up in Vinculado's face, and kept saying he didn't want any problems with Vinculado. Vinculado tried to remain calm, he did not say or do anything physical to provoke [defendant]. Vinculado told [defendant] they didn't have any problems, and at that point, Vinculado thought he had defused the situation. After [defendant] made a few comments, he walked away. O'Neil felt uncomfortable, so she and Vinculado walked to the other side of the platform, in the opposite direction of where [defendant] had gone.

"Vinculado had his back to [defendant] when O'Neil saw [defendant] running towards Vinculado with a chain over his head. [Defendant] swung the chain around and the lock on the chain hit Vinculado on the head, causing him to fall to the ground. Vinculado did not see [defendant] coming, but he felt a blow to his head which knocked him down. Vinculado had a gash on his head and was bleeding. Vinculado momentarily lost his vision, but once it returned, he saw [defendant] running away with a lock in his hand. Vinculado sat up a little bit and screamed, 'what did I do to you?'

"The whole thing happened in a matter of maybe 10 seconds. Paloma Muela called 911 from her cell phone. Steve Jackson also called 911 and while he was on the phone,

2

[defendant] charged at him and yelled, 'I'll kill you.' Jackson believed King was going to hit him.

"[Defendant] boarded the train, but was detained by the police. . . . [¶] . . . [BART Police Department Patrol Officer Deborah] Early recovered a chain at the scene that was approximately 12 inches long with a two-inch Master padlock on it. She found the chain sitting on the ground about 10 feet away from where King was sitting when she arrived."

Defendant's appearance during and immediately after these events was described by numerous witnesses. Vinculado described defendant, when he first approached him, as appearing "frustrated or irritated." O'Neil described defendant as appearing "angry and agitated"; she did not smell alcohol on his breath. Muela described defendant as appearing "just furious. Whatever it was he was saying [to Vinculado], he was just angry, like intensely angry." Prior to attacking Vinculado, defendant "was pacing back and forth a lot. He didn't know, really, where he was going. He would . . . go out this way and turn around and fast walk the other way. At one point he walked half way up the stairs and then came back down to the platform." Jackson testified that in the course of his work he frequently comes in contact with people who are under the influence of alcohol and drugs, and that he observed nothing about defendant's conduct or appearance that lead him to believe defendant was under the influence of alcohol or drugs. He testified that defendant "never staggered. His speech wasn't staggered. His walk wasn't staggered. He walked all the way down to the end of the BART platform. He walked all the way back. He . . . just seemed mad, angry, and violent. He didn't seem drunk. He didn't seem like he was on drugs. He didn't seem anything like that."[3]

San Francisco Police Officer Sean Frost, who arrived at the BART platform as defendant was being placed in handcuffs by other officers, "sometime after 8 o'clock p.m.," observed no signs of intoxication from the defendant. Defendant said "nothing

---

[3] Jackson testified further that when defendant threatened to kill him, he replied something like, "Hey, do what you're going to do, but if you hit me, you're going to prison," at which point defendant "grabbed his shirt collar and pulled it down . . . to like show tattoos and said 'I've been to prison. I don't give a fuck.' "

3

sticks out in my head that would have made me thought that [defendant] had some [type] of altered mental status. Because if that had happened, we probably would have had to call an ambulance for him. That is typically what we always do." When Officer Early arrived at the BART station at about 10:00 p.m., defendant was sitting quietly next to another officer in custody. She "did not smell any alcoholic beverage on his breath, and he was very calm." Later that evening defendant was interviewed at a BART police station by Detective John Power. The detective did not "see any signs of [defendant] being under the influence of drugs or alcohol during the course of [the] interview with him." The interview was videotaped and the tape was played for the jury. During the interview, defendant gave answers that appeared to be largely delusional.[4] Power attributed "the strange nature of his response[s]" to "more of a psychological issue."

The theory of the defense was that earlier in the day a stranger had spiked defendant's beer with a hallucinogenic substance that rendered him essentially unconscious and with no recollection of having struck Vinculado. Defendant testified in his own defense. Quoting again from defendant's appellate brief, his testimony is summarized as follows: "On October 14, 2011, [defendant] was at Occupy Oakland, speaking before a group about human rights until around 1:30 or 2:00 p.m. While he was talking to a girl, some guy he had never met before offered him a beer. [Defendant] refused, saying he did not drink, but the guy pleaded with him, so defendant decided to have a drink with the guy. He took two sips of the beer, but it tasted funny, coppery and bitter. [Defendant] asked the guy what was wrong with the beer, but the guy told him to just enjoy it. Defendant pushed the guy and told him he had no right to give him

---

[4] Defendant said he was a "military attaché" with the CIA. At one point he asked Power to remove his handcuffs and told him, "as a member of the CIA that was just an order. I outrank you, sir. Please handle your business accordingly." When Power refused, defendant continued, "Okay, I am going to tell you this if you don't do as I ask you, I will make heads roll."At another point defendant gave a rambling, largely incoherent explanation of what lead to him "turn[ing] around and I fucking whacked his ass upside the head with a chain." When asked what went through his mind before he whacked him, defendant responded, "What'd I think? I thought he was going to turn around and stab me. As a member of the CIA, it's my every right to whack that bastard."

4

something like that. Security came over and separated them. Defendant went to the medical tent, he wanted someone to observe him because he wasn't sure what the effects of the beer would be. After about 25 to 30 minutes, [defendant] began to feel hot, like his body was on fire, and things were hazy. [¶] [Defendant] was asked to leave because he had pushed the guy who spiked his beer. Defendant went to get his bicycle, but it was gone. The chain had been cut, and the lock, was laying on the ground, so [defendant] put it in his pocket. [Defendant] was feeling the effects of whatever was in his drink, as he headed down to the BART station. The effects were getting more intense. [Defendant] was becoming agitated and scared. He got on a train, believing he was going to Hayward, and the next thing he knew, he was in San Francisco."

Defendant testified that he did not recall getting off the BART train, but he did remember an exchange with Vinculado in which Vinculado threatened him with a knife. Asked what he did after he saw the knife, defendant answered, "I don't know. Next thing I know is they were taking me off the train." He did not remember hitting Vinculado. Defendant testified that he remembered an interaction with Jackson, who he said chased him around the station. And he testified to experiencing hallucinations in the BART station and in jail. While talking to an officer in the BART station, "he turned into an alien," "his face got real long, and he had big teeth. And you ever seen the movie 'Predator'? He had little things coming off of his head." In jail he "was trying to flush myself down the toilet so that I could get out . . . ."

Finally, a volunteer who worked for the medic group at Occupy Oakland, Michael Terry, testified that although the medic personnel maintained records of the people who used the medic tents, all of those records were confiscated by the police on October 25, and never returned them. However, Terry testified that he recognized defendant and was sure that he had seen him at the Occupy Oakland encampment.

*Jury instructions and closing arguments*

The jury was instructed that voluntary intoxication is not a defense to assault, but that "[i]f you find that the defendant was involuntarily intoxicated and as a result believed

5

that Mr. Vinculado was going to stab him with a knife, he did not have the specific intent or mental state required for assault with a deadly weapon."[5] The jury was also instructed: "The defendant is not guilty of assault with a deadly weapon . . . if he acted while legally unconscious. Someone is legally unconscious when he or she is not conscious of his or her actions. Someone may be unconscious even though able to move. [¶] Unconsciousness may be caused by involuntary intoxication. [¶] The People must prove beyond a reasonable doubt that the defendant was conscious when he acted. . . . ."

In his closing argument defense counsel did not dispute that defendant had assaulted Vinculado but argued that "what this case is all about, really, is what happened earlier, and what happened earlier is Mr. King was drugged at Occupy Oakland. He was dosed and mickeyed. And how do we know this? Well, one. You saw him [referring to the videotape of his interrogation by Detective Power]. . . . You saw the evidence of the man clearly out of his mind, clearly delusional, hallucinating. Two, the guy who drugged [defendant] admitted it. The guy said 'Don't worry. It's nothing you won't enjoy.' "

Referring to the videotape in reply, the prosecutor argued there were four possible explanations "for the defendant's behavior up there." One was mental illness (which he pointed out was not a defense and for which there was no competent evidence), a second possible explanation was malingering or faking, and a third was voluntary intoxication. As to the fourth possibility, involuntary intoxication, the prosecutor argued that from the videotape it could not be determined whether defendant was voluntarily or involuntarily intoxicated, or mentally ill. And as to whether "[t]he guy that actually slipped him a mickey admitted to him that he had given him something that he would enjoy. How do we know that? What is the only evidence we have? The defendant's word, his word on the stand. We didn't hear from the guy with the British accent; we didn't hear from the

---

[5] The instruction also stated: "The defendant is not guilty of assault with a deadly weapon . . . if he did not have the intent or mental state required to commit the crime because he reasonably did not know a fact or reasonably and mistakenly believed a fact. If the defendant's conduct would have been lawful under the facts as he believed them to be, he did not commit assault with a deadly weapon . . . ."

6

girl that was there; we didn't hear from the paramedics. . . . Ask yourself. Is the explanation offered by the defense reasonable?"

*The verdict*

The jury found defendant guilty of assault with a deadly weapon not a firearm (§ 245, subd. (a)(1)), and found true that defendant had suffered two prior convictions within the meaning sections 667, subdivisions (d) and (e) and 1170.12, subdivisions (b) and (c), and four prior convictions within the meaning of section 667.5, subdivision (b). The jury could not agree on a second count which charged defendant with making criminal threats to Steve Jackson, and that count was later dismissed in the interest of justice.

*Motion for New Trial*

Defendant filed a motion for a new trial on the ground of newly discovered evidence. The supporting declaration filed by his trial attorney explained: "After the verdict came in this case I received a call from Michael Terry who informed me that his wife had been talking to a friend of hers about the case her husband, Mr. Terry, was testifying in and the friend, a Mr. Gorgio Bianchi, informed her that he was at Occupy Oakland on October 14th, 2011, and recalls the incident in question. Mr. Bianchi identified [defendant] from a photograph Defense counsel provided to Mr. Terry." A supporting declaration from Bianchi read as follows: "I was at Occupy Oakland on October 14, 2011. [¶] At that time I saw an individual in a physical confrontation with another man. [¶] This individual claimed that the man he was fighting with had drugged his beer. [¶] The individual who claimed he had been drugged was escorted off the Occupy premises because of his violent reaction to the man who he claim[ed] had drugged him. [¶] In June of 2012, I was shown a photograph of [defendant]. [Defendant] is the same individual I saw on October 14, 2011 at Occupy Oakland claiming he was drugged."

Trial counsel's declaration also stated that he had spoken with two jurors who indicated that this new evidence might have caused them to change their votes as jurors.

7

"Juror number 1 told me that the reason she found [defendant] guilty on count 1 is because she believed he had made up his defense of being involuntarily intoxicated. She further informs me that if she had heard the testimony of Gorgio Bianchi, that very well may have changed her decision in this matter and the decision of other jurors as well." The attorney "informed juror #4 what Mr. Bianchi would have testified to as delineated in Mr. Bianchi's affidavit. Juror #4 told me that very likely would have changed his vote depending upon the credibility of Mr. Bianchi on the witness stand."

After a hearing, the trial court denied the new trial motion, with the following explanation: "I don't believe that the affidavits would have led to a different result in this case based on the evidence that has been submitted at trial and both evaluation on the affidavits in this matter."

*Romero motion and judgment*

As part of defendant's sentencing memorandum, defendant requested the court to strike his prior strikes under section 1385. (*People v. Superior Court (Romero)*, *supra,* 13 Cal.4th 497.) The court subsequently struck the four prior convictions pled under section 667.5, subdivision (b) but denied the motion to strike the two priors under sections 667, subdivisions (d) and (e) and 1170.12, subdivisions (b) and (c). The court explained the reason for its ruling as follows: "I acknowledge that the age of the two prior strike convictions goes awhile back. The defendant falls within the purview of the Three Strikes Law because he has been a repeat offender. Since the 1980's he's been convicted of an additional three felonies and five misdemeanors, has never been free from custody for more than a year, as he has conceded, himself, and has been sentenced to an aggregate total of more than two dozen years in state prison. The instant offense was unprovoked. This is a violent offense."

The court sentenced defendant to a prison term of 25 years to life as a third offender, plus 10 years for the two prior serious felony convictions, for a total sentence of 35 years to life. Defendant has timely appealed.

8

**Discussion**

1. *The trial court did not abuse its discretion in denying the motion for a new trial.*

Section 1181, subdivision 8 authorizes the court to grant a new trial upon newly discovered evidence. The factors that the court should consider in ruling upon the motion are well settled: " ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result more probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at trial; and 5. That these facts be shown by the best evidence of which the case permits." ' " (*People v. Turner* (1994) 8 Cal.4th 137, 212.)

" 'To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial.' [Citation.] '[T]he trial court has broad discretion in ruling on a new trial motion . . . ,' and its 'ruling will be disturbed only for clear abuse of that discretion.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 308.) " ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

In the trial court, the prosecutor argued that the motion should be denied because defendant had not demonstrated reasonable diligence in obtaining the evidence and because the new evidence was not likely to produce a different outcome.[6] As indicated above, in denying the motion, the court relied only on the latter ground, and we shall similarly restrict our consideration. (*People v. Delgado, supra,* 5 Cal.4th at p. 329, fn. 7 [no need to consider other grounds if motion denied because of unlikeliness of different result on retrial].)

---

[6] Prior to the submission of the Bianchi declaration, the prosecutor also argued that defendant had failed to provide the best evidence of the facts to which Bianchi would testify. However, the court permitted defendant to file the Bianchi declaration, disposing of that issue.

Initially, those portions of the declaration of defendant's attorney reciting the reasoning of two jurors in reaching their verdict and stating how Bianchi's testimony may have affected their vote is of questionable admissibility. (Evid. Code, § 1150, subd. (a); see, e.g., *People v. Danks* (2004) 32 Cal.4th 269, 301-302.) Although a defendant "has met his burden of establishing that a different result is probable on retrial of the case if he has established that it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented" (*People v. Soojian* (2010) 190 Cal.App.4th 491, 521), "the test is not a subjective one[,] whether a particular trier of fact would be persuaded by the new evidence to reach a different conclusion, but rather is an objective one based on all the evidence, old and new, whether any second trier of fact, court or jury, would probably reach a different result" (*People v. Huskins* (1966) 245 Cal.App.2d 859, 862; see *People v. Bishop* (1993) 14 Cal.App.4th 203, 212). The trial judge's determination of that question may be overturned only for a "manifest and unmistakable abuse of discretion." (*People v. Verdugo, supra,* 50 Cal.4th at p. 309.)

As indicated above, in argument to the jury the prosecutor attempted to cast doubt on defendant's testimony that at the Occupy Oakland encampment a stranger had spiked his beer without his knowledge by arguing that this testimony was not supported by any other witness. Bianchi's testimony would have tended to provide such support. Nonetheless, the trial court could reasonably conclude based on the trial testimony of seven witnesses that whatever defendant had sipped at the encampment, he was not intoxicated or unconscious hours later in the BART station, and that Bianchi's testimony would not have caused any trier of fact to conclude otherwise. The court could well conclude that the consistent testimony of the several witnesses who observed defendant in the BART station and when he was in custody provided convincing evidence that, whatever defendant may have consumed at the encampment and whatever his mental problems may have been, he was not drunk or under the influence of drugs in the BART station, and that Bianchi's testimony would not have affected that finding.

The Attorney General suggests other reasons for which the court could reasonably have concluded that Bianchi's testimony was not likely to affect the outcome. There was

10

a possible inconsistency between the statement in the Bianchi declaration that the man who claimed that his beer had been drugged was escorted off the encampment premises because of his violence towards the man he claimed had drugged him and defendant's testimony that after taking two sips of the beer he went to the medic clinic for a half hour. Bianchi's declaration said nothing about the clinic, suggesting a possible basis for questioning his credibility. (*People v. Delgado, supra,* 5 Cal.4th at p. 329 [" 'trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable' "].) Moreover, even if Bianchi's testimony confirmed that defendant believed his beer had been spiked, the testimony would not necessarily establish that it had in fact been spiked, much less that it had been spiked with a substance powerful enough to render defendant unconscious hours later.

Still further, defendant's selective memory—recalling interactions at the BART station with Vinculado, Jackson and others, but not recalling anything after he allegedly observed Vinculado with a knife until he was removed from the BART train—could well cause jurors to doubt his credibility regardless of what Bianchi might testify.

In denying the new trial motion, the trial court made reference to *People v. Dyer* (1988) 45 Cal.3d 26. Contrary to defendant's argument, that decision does provide support for the trial court's conclusion here. In denying a motion for a new trial in that case, the court stated: "[D]efendant never denied that the events took place substantially as [two witnesses] testified. Thus even if the evidence somehow could be considered 'new,' defendant has failed to demonstrate that admission of the testimony of two witnesses that he appeared 'spaced out' hours before the murders would likely have led to a different result." (*Id.* at p. 52.) Similarly, we cannot say that the trial court here abused its broad discretion in determining that Bianchi's testimony that he observed defendant accusing someone of having spiked the beer from which he took two sips would not be likely to change the finding that considerably later he was not involuntarily intoxicated or unconscious when he committed the assault for which he was convicted.

11

2. *The trial court did not abuse its discretion in denying the Romero motion.*

Defendant asserts that the trial court erred in denying his *Romero* motion to strike his two prior strike convictions "without considering the particulars of his background, character, and prospects, and specifically how his well-documented, long-standing mental illness affected these things." Although in explaining its ruling the court made no mention of those matters, it does not follow that the court failed to consider them. The court was not required to provide any explanation for its denial of the motion (*In re Large* (2007) 41 Cal.4th 538, 550). The defendant's criminal history to which it did refer presumably, in the court's view, outweighed any other considerations and was the controlling reason, amply supported by the evidence, that defendant fell within the "spirit" of the Three Strikes Law. (*People v. Williams* (1998) 17 Cal.4th 148, 161.) There is, to be sure, good reason to question whether defendant's apparent mental health problems are best addressed by permanent incarceration. However, it is for the Legislature to provide more constructive remedial programs and facilities. Section 1385, as construed in *Romero,* is not such a remedy.

**Disposition**

The judgment is affirmed.

_____
Pollak, J.

We concur:

_____
McGuiness, P. J.

_____
Jenkins, J.

12