Filed 12/2/13  P. v. Skuba CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEWART LAW SKUBA,<br><br>    Defendant and Appellant. | H037984<br>(Santa Cruz County<br>Super. Ct. No. F18186) |

Stewart Skuba advances three challenges to his first degree felony murder conviction.  He argues that the trial court erred by failing to instruct the jury sua sponte with CALCRIM instruction 3261 (the "escape rule") or, in the alternative, by failing to augment CALCRIM instruction 549 with the escape rule's temporary safety concept.  He also argues that the trial court erred by failing to define "logical connection" in CALCRIM instruction 540C.  Finally, he contends that the trial court abused its discretion by excluding impeachment evidence regarding the credibility of a key prosecution witness.  For the reasons we explain below, we will affirm the conviction.

## I.  FACTS AND PROCEDURAL BACKGROUND

### A.    PROSECUTION'S CASE

The prosecution alleged that Skuba and his friend Adam Hunt robbed Elias Sorokin in Skuba's Santa Cruz home on or about July 20, 2009.  After the robbery, Skuba and another friend Kenneth Clamp moved an unconscious Sorokin to the bed of Sorokin's pick-up truck, drove north on Highway 1, and threw Sorokin off a cliff.

Sorokin's body was not recovered at the time of trial. Skuba was charged with first degree felony murder (Pen. Code, §§ 187, 190.2, subd. (a)(17)), second degree robbery (Pen. Code, § 211), and kidnapping (Pen. Code, § 209). The prosecution presented testimony from four witnesses who were at Skuba's home when the robbery occurred: Skuba's close friend Kirstin Roberts, Roberts' father George Roberts, Sr. (Senior), Roberts' younger brother George Roberts, Jr. (Junior), and a friend Timothy Wentzel. The testimony of each is summarized below as it relates to this appeal.

### 1. Roberts' Testimony

In July 2009, 19-year-old Roberts was living with Skuba at his home on Felix Street. Skuba, who was about 30, shared his ground-floor bedroom with Roberts without charging her rent. Roberts was an alcohol and methamphetamine addict. She starting using alcohol excessively when she was 16. In 2009, she drank continuously and was intoxicated most of her waking hours. She smoked methamphetamine a lot, sometimes with Skuba. Roberts' alcohol and methamphetamine use "blurred things" from that time period.

Before July 20, 2009, Skuba had bragged to Roberts about a friend from Los Angeles who was a "big time pot dealer." Two days before Sorokin was murdered, Skuba told Roberts someone from Los Angeles was going to visit, either with marijuana or to buy marijuana. On July 20, Skuba told Roberts someone was coming from Los Angeles and "we are going to jack him for his weed." Also on July 20, Roberts found a small bottle wrapped in tape in Skuba's bedroom. Skuba told her it was chloroform and could be used to knock a person out.

During the evening of July 20, Skuba and his friends Adam Hunt and Timothy Wentzel smoked methamphetamine in Skuba's bedroom, and Roberts "hung out" with them drinking. Roberts had been drinking whiskey from the time she woke up. She felt the effects of the alcohol but was able to walk and converse. At some point Skuba asked Roberts and Wentzel to go upstairs so he could "handle some business." After watching

television in the upstairs living room for about 30 minutes, Roberts heard sounds of a struggle from downstairs and someone saying "Please don't. Stop." Roberts was upset, turned up the television, and said "No Stewart."

Senior entered the living room from the bedroom he shared with Junior. He was upset and dialing 911 on his phone. Roberts thought Skuba was doing what he had told her earlier-"jacking some guy for his weed"-and she wanted to protect him so she told Senior not to call the police. Senior acceded to his daughter's wishes and left the house with Junior. About 15 minutes later Skuba came upstairs sweating and appearing freaked out. He continued to the third floor carrying the clothes he had been wearing earlier, and Roberts heard the washing machine start. Skuba returned to the second floor and told Roberts it was okay to go back downstairs.

Roberts and Wentzel went downstairs and Wentzel left the house. Roberts knocked on the bathroom door. She heard running water and Hunt say "I'm in here." She joined Skuba on the porch and smoked a cigarette. Skuba told Roberts the chloroform did not work, that he and Hunt got into a fight with "him," that "he" was knocked out, and not to go into the garage. Roberts went outside and saw Sorokin's truck in the driveway. She climbed inside looking for something to steal, but found nothing she wanted. Skuba told her to get out of the truck and she returned to the house with him.

Appearing upset, Skuba told Roberts that Hunt had left. Skuba called his friend Kenneth Clamp and said "Hey home boy, get over here. I need your help." Not long afterward, Clamp arrived. When he saw Roberts, Clamp said "What the hell is she doing here?" Clamp asked Skuba if he could live with this for the rest of his life. Freaked out, Skuba responded "Yes. He knows where my mom lives." As Skuba grabbed a blue blanket from his closet, Clamp told Roberts to clean up the blood after they left. Skuba left through the back door with the blue blanket, Clamp left through the front door, and Roberts went upstairs to the living room balcony. From the balcony Roberts heard the

garage door opening and closing, a dragging sound from the area of the garage, a tailgate opening, a thump, a tailgate closing, and trucks leaving.

After Skuba and Clamp left in the trucks, Roberts cleaned up blood in the bathroom. She went to Skuba's bedroom and saw items she had not seen before, including a wallet, a laptop, a guitar, boxes containing marijuana pills, and ten bags of marijuana in the closet. She looked through the wallet and saw Sorokin's driver's license and credit cards. She entered the garage and cleaned up more blood. She saw drag marks near the front of the garage.

Skuba and Clamp returned after being gone for at least an hour, and Hunt reappeared about 30 minutes later. Clamp divided the bags of marijuana equally among the men and gave one bag to Roberts. The group also divided up the marijuana pills and may have divided up the credit cards. Skuba and Hunt spoke about the fight they had with Sorokin. After Clamp and Hunt left the house, Skuba told Roberts he and Clamp had driven up the coast toward Davenport-Skuba in Sorokin's truck and Clamp in his own-and that "[t]hey threw him off a cliff." Skuba told Roberts "he could hear the body go thudding down."

The next day Roberts left Skuba's house with Senior and Junior for a motel. On July 22 Roberts went to a Target store in Watsonville with Skuba and attempted to purchase over $500 in merchandise using one of Sorokin's credit cards. The card was refused. A few days later, after seeing missing person flyers identifying Sorokin, Roberts told Senior that Sorokin was at Skuba's on July 20 and that she had cleaned up the blood. When she confided in Senior, she had no bad feelings for Skuba, but she was scared of Clamp. Senior advised her to call the police.

On July 30, Roberts and Skuba were passengers in a stolen car pulled over by the police. The group was headed to Watsonville to sell marijuana. Roberts was arrested and asked to speak with a detective, whom she told about the murder because she did not

want it on her conscience. She told police that Skuba, Hunt and Clamp were involved in the murder, and she eventually admitted that she had cleaned up the blood.

Roberts pleaded guilty to the robbery in this case and had not been sentenced at the time of Skuba's trial. A condition of her plea agreement required her to testify truthfully. Roberts acknowledged a felony forgery conviction from July 2009, which involved her cashing two checks stolen from one of Skuba's roommates. She also acknowledged a conviction for driving under the influence of alcohol, an incident which involved an accident in which a third party was injured.

### 2.     Senior's Testimony

Senior came to Santa Cruz in July 2009 to help Roberts who was having problems with alcohol and the law. Because Senior was financially strapped, Skuba opened his home to Senior and his 17-year-old son. On the night of Sorokin's murder, father and son shared an upstairs bedroom. Senior knew that Roberts drank abusively and smoked methamphetamine.

On July 19 or 20 Senior observed a small container wrapped in what looked like electrical tape in Skuba's bedroom. Skuba told Senior it was chloroform, and Senior joked about using the chloroform on a landlord to whom he had lost a deposit.

On the night of the murder Senior was awakened by Junior shaking him and telling him it sounded like someone was being beaten or killed. Senior heard crashing around, as if someone was having an argument and was pushed into furniture. He heard muffled voices and what appeared to be cries for help. The noise came from Skuba's room which was under the kitchen next to the garage. Senior entered the living room about to call 911, but Roberts told him not to. Senior gathered some things and, followed by Junior, left the house because of the noise. He went to his car parked on the street. Before falling asleep he saw a red pickup truck enter the driveway. He also saw Sorokin's truck and the red truck pull out of the driveway.

Reentering the house the next morning, Senior smelled very fresh marijuana coming from Skuba's room and a big black bag in front of Skuba's closet. He had not smelled marijuana in the house before. Skuba and Roberts both gave Senior marijuana from the bag. Senior also saw a black guitar case in the room and Sorokin's credit cards on Skuba's bed. Roberts offered one of the credit cards to Senior, but he would not take it. Senior did not notice the bottle that Skuba earlier had said contained chloroform. Senior left Skuba's home for a motel with Roberts and Junior. Several days after the murder Roberts told Senior what had happened. She told Senior she knew something was going to happen but she was not there when it happened, and that "they" made her clean up blood in the garage. She was crying hysterically and scared for her life.

### 3. Junior's Testimony

Junior was 17 and homeless when he met Skuba in July 2009. Skuba was kind to Junior and protected him, and Junior considered Skuba a true friend. Two or three days before Sorokin's murder, Skuba, Senior, and Junior had a conversation about chloroform. Junior did not remember who brought up the subject, but Senior joked about using chloroform on a landlord who had cheated him out of some money.

On the night of the murder, when Junior was in his bedroom laying next to his sleeping father, he heard a muffled male scream and banging as if someone were fighting. Concerned, he awakened Senior who said he would call 911 but ultimately did not because Roberts told him not to. Instead, Senior and Junior left the house. Catching up with Junior outside, Skuba told him to stop crying and said something like, "I just did something to help you guys so please calm down. Everything is going to be alright." Junior joined Senior in the car for the night. He saw a red truck arrive and later the red truck and another truck leave.

The next day before Junior left for the motel, Skuba gave him the acoustic guitar that was in his bedroom. Roberts showed Junior a black bag in Skuba's closet containing

clear plastic bags. Each clear bag contained a pound or two of marijuana. Roberts gave Junior and Senior some of the marijuana.

### 4. Wentzel's Testimony

In July 2009, Wentzel had known Skuba for a couple of months and Roberts for about a month. He bought methamphetamine from Skuba, smoked with him, and became friends with him. Wentzel also smoked methamphetamine with Roberts, but she drank more than she smoked.

The night of the murder Wentzel went to Skuba's house to buy methamphetamine. He joined Skuba, Roberts and Hunt in Skuba's bedroom. Roberts, who was drinking hard alcohol from a bottle, was drunk and slurring her words. Wentzel and Skuba smoked methamphetamine for about an hour while Roberts drank. At some point Skuba asked Wentzel and Roberts to go upstairs because he had "some business" to handle. While Hunt remained in Skuba's bedroom, Wentzel and Roberts went upstairs and watched television.

Wentzel heard a commotion downstairs, as if two people were rough-housing or throwing things across the room. The ruckus grew louder and sounded like a fight. Roberts, emotional with tears in her eyes, said "Oh, Skuba, no. Skuba, no. Don't." Twice she turned up the television to drown out the sounds. Wentzel also was trying to "tune it out." Senior came out of the bedroom and argued with Roberts. He did not like the noise and, followed by Junior, went downstairs. Wentzel and Roberts remained in the living room until an out-of-breath Skuba came upstairs and told them they could go downstairs because his "business" was finished. Wentzel left the house.

## B. THE DEFENSE'S CASE

Skuba befriended Sorokin through large-scale marijuana dealings. In 2008, Skuba earned about $70,000 selling marijuana. That same year Sorokin rejected an offer to buy several pounds of marijuana from Hunt because the marijuana was grown outdoors.

Skuba met Roberts when she was 17 and homeless. They were good friends and involved romantically "off and on." Roberts drank excessively and sold drugs. Although he had smoked methamphetamine daily in the past, Skuba was smoking methamphetamine less frequently-a couple of times per week-when Roberts started staying with him in May 2009.

Senior came to Santa Cruz in July 2009 to help Roberts with upcoming court appearances. Shortly after Senior arrived, Roberts was arrested for cashing a bad check. When Roberts was in jail, Skuba invited Senior to stay at his house through the end of the month.

On July 17, Skuba's friend Dominic fronted Skuba ten pounds of marijuana. which Skuba put in his bedroom closet. The marijuana, valued at $30,000, emitted no odor because it was sealed in turkey bags. Skuba had only $1,800 at the time, and was planning to sell the marijuana to Sorokin, with whom he was in close contact. In arranging the July 20 visit, Skuba also told Sorokin he would pay him back $500 if he came to Santa Cruz.

On the night of the murder, Roberts, Hunt, and Wentzel were with Skuba in his bedroom when Sorokin called. Skuba walked two blocks to the 7-Eleven to meet Sorokin. They returned in Sorokin's truck where Sorokin waited while Skuba told Roberts and Wentzel to go upstairs. Skuba first testified that Sorokin arrived about 11:00 p.m., but later said it might have been after 12:31 a.m., when cell phone records showed Sorokin placed his last call to Skuba. Sorokin came inside with his guitar and laptop. He, Skuba, and Hunt socialized for at least an hour or so on the back patio. Later, when confronted with phone records showing Hunt called him at 12:58 a.m. and 1:12 a.m., Skuba testified he was not sure how long he and Hunt socialized with Sorokin. It may have been only 35 minutes but it felt longer.

Skuba showed Sorokin a pound of the marijuana from his closet and told him ten pounds were available. He then returned the pound to the front of his closet, leaving the

other nine pounds in a large bag.  Skuba gave Sorokin the $500 he owed him, and Sorokin gave Skuba three boxes of medical marijuana pills that were given to him as samples and he no longer wanted.

Hunt then went outside to "holler at" Sorokin because he was upset about their 2008 failed marijuana deal.  Skuba could not see them, but he heard Hunt talking about $30,000 and getting stuck with ten pounds of marijuana.  Skuba went to the porch and suggested they move their discussion to the garage so as not to disturb the neighbors. Hunt and Sorokin went into the garage and Skuba listened to music in his room over surround sound speakers.  He was high on methamphetamine, not listening for noise, and heard nothing from the garage.  Hunt returned a few minutes later, washed blood off his hands in the bathroom, and threatened Skuba with a gun.  Hunt told Skuba he would kill him if he called the police, and he knew where his family lived and would kill them too.

Skuba entered the garage where he found a dead Sorokin.  Skuba had no idea Hunt was going to kill Sorokin.  Skuba went back inside but Hunt was gone.  Skuba followed Junior outside and told him "Something crazy just happened.  I've got a lot going on right now."  He returned to the house with Roberts, whom he had found in Sorokin's truck. Skuba did not call the police because he was afraid for himself and his family.  He thought Hunt would kill him.  Instead, Skuba called his friend Clamp, a "big bad dude" who has been to prison for attempted murder and who Skuba thought could protect him from Hunt.

When Clamp arrived he confirmed that Sorokin was dead.  Skuba told Clamp what happened (except he did not tell him that he had arranged a marijuana deal for Sorokin) and asked Clamp for advice.  Clamp told Skuba he could either "clean it up" or call the police.  Clamp told Skuba he had to make a decision that would affect the rest of his life. Skuba told Clamp "he knows where my parents live," but he was referring to Hunt, not to Sorokin who was dead.

Hunt then returned and told Clamp he killed Sorokin because Sorokin had disrespected him. When asked by Clamp whether he took anything, Hunt told him he took $500 from Sorokin's pocket, and he also mentioned that Sorokin had come to buy marijuana that was in the closet. To the horror of Skuba, Clamp discovered the marijuana in Skuba's closet and decided to keep it. Clamp took control of the situation, went into the garage with Hunt, and loaded Sorokin's body in the back of Sorokin's truck. Clamp and Hunt returned to Skuba's room, where Clamp asked Roberts if she would remain solid and told her they would give her marijuana if she cleaned up the blood in the garage. Hunt gave her a bottle of cleaner from his backpack. Clamp told Skuba to drive Sorokin's truck up the coast, he would follow, and Hunt would stay behind and watch Roberts.

As they left Santa Cruz, Clamp took the lead. They turned off Highway 1 and drove into the mountains, but ended up back on Highway 1 near the ocean, where Clamp told Skuba to switch vehicles. Skuba waited in Clamp's truck for about a half hour, and when Clamp returned they drove back to Skuba's home.

Skuba and Clamp returned to find Hunt and Roberts in his bedroom going through Sorokin's credit cards and laptop bag. Clamp and Hunt each took four pounds of marijuana and gave the remaining pound to Roberts. Clamp, Hunt, and Roberts each took a box of marijuana pills. Clamp and Hunt took Sorokin's credit cards. Skuba took nothing. After Clamp and Hunt left, Skuba cried and told Roberts he could not believe what had happened. The next day Skuba gave Junior Sorokin's guitar because Junior played it well and Skuba did not know what else to do with it. That evening Senior, Junior and Roberts left for a motel after Skuba told Roberts they would be safer there and he gave her money to pay for a room.

On July 22, Clamp and Roberts arrived at Skuba's home where Clamp gave Skuba three of Sorokin's credit cards and told Skuba to buy him things as more compensation for what had happened. That evening Skuba and Roberts attempted to purchase $546 in

merchandise from Target but the card was declined. Skuba felt awful using the credit cards but felt he had no choice.

Before he was arrested, Skuba discussed the stolen marijuana situation with his supplier, Dominic, who was unhappy but accepted the loss because he knew Skuba would work off the debt. When arrested on July 30, Skuba had two bags of marijuana in his laptop bag, including the one-pound sample he had shown to Sorokin. Skuba did not hear from Dominic after he was arrested and taken into custody.

The jury watched a DVD of Skuba's July 30 interview with the police. Skuba testified that almost everything he told the police during the interview was untrue. He lied to the police because he had been smoking methamphetamine, was sleep deprived, was scared of Hunt and Clamp, and was not thinking straight. Among his lies, Skuba told the police that Sorokin had a concussion but was conscious after the fight with Hunt, that Hunt left for the hospital in Sorokin's truck with Sorokin, who was alive at that point, and that he tried to call Sorokin several times after the assault.

Skuba testified that he never told Roberts that he was going to jack a guy from Southern California for his weed. Skuba never spoke to Roberts about chloroform and he never had chloroform in his room. The only mention of chloroform was by Senior, when he told Skuba about a bad experience with a landlord. Skuba never went upstairs after the fight to tell Roberts and Wentzel they could come downstairs. He did not use the washing machine after the fight. He never told Roberts that he and Hunt had fought someone who was unconscious in the garage. He never told her that Sorokin's body went thudding down the cliff.[1]

---

[1] On rebuttal Roberts insisted that Skuba received three of the ten bags of marijuana. She also maintained that she was never told to buy anything at Target for Clamp, and that she never heard Clamp tell Skuba to buy things for him.

## C.     THE VERDICT AND CONVICTION

A jury convicted Skuba of first degree felony murder and second degree robbery. The jury also found true the special circumstances allegation that the murder was committed while Skuba was part of a conspiracy to commit robbery. The jury did not reach a unanimous verdict on kidnapping. Skuba was sentenced to life without parole. He timely appealed.

## II.  DISCUSSION

## A.     THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON FELONY MURDER

### 1.     The Escape Rule Does Not Apply When the Victim Remains Under The Control of the Defendant or an Accomplice

Penal Code section 189 provides for murder in the first degree when a killing "is committed in the perpetration of, or attempt to perpetrate . . . robbery . . . ." In the context of felony murder, the phrase "in the perpetration of" has been defined broadly to include a killing occurring during a perpetrator's flight, or escape, from the scene of a robbery. (*People v. Boss* (1930) 210 Cal. 245, 250-251 [explaining that a robbery is not completed as long as the robbers are fleeing from the scene of the crime, having "not won their way even momentarily to a place of temporary safety and the possession of the plunder is nothing more than a scrambling possession."].) The escape rule extends felony murder liability to accidental deaths occurring during a perpetrator's flight from a robbery scene " 'because the robbery and the accidental death . . . are parts of a "continuous transaction".' " (*People v. Wilkins* (2013) 56 Cal.4th 333, 345 (*Wilkins*).) Thus, the rule is used to determine the outer temporal bounds of felony murder liability: Any killing occurring after a perpetrator reaches a place of temporary safety is not committed in the perpetration of robbery and thus does not constitute a felony murder. (*Id.*, pp. 344-346.)

Skuba argues that the trial court erred by failing either to instruct the jury sua sponte with the escape rule (CALCRIM 3261),[2] or to supplement the "one continuous transaction" instruction (CALCRIM 549)[3] with the temporary place of safety element of the escape rule. He contends further that the error was prejudicial. In the event we deem him to have forfeited his claim by failing to raise it below, he contends in the alternative that his trial counsel was ineffective for failing to request the instruction below.

A legally correct jury instruction should be given if it is supported by substantial evidence. (*Wilkins*, *supra*, 56 Cal.4th at p. 347.) According to Skuba, substantial

---

[2] CALCRIM no. 3261, as applied to robbery, reads: "The crime of robbery [or attempted robbery] continues until the perpetrator[s] (has/have) actually reached a temporary place of safety. [¶] The perpetrator[s] (has/have) reached a temporary place of safety if: [¶] • (He/She/They) (has/have) successfully escaped from the scene; [and] [¶] • (He/She/They) (is/are) not or (is are) no longer being chased(; [and]/.) [¶] • [(He/She/They) (has/have) unchallenged possession of the property(; [and]/.)] [¶] • [(He/She/They) (is/are) no longer in continuous physical control of the person who is the target of the robbery.]"

[3] The court instructed the jury with CALCRIM 549: "In order for the People to prove that the defendant is guilty of murder under a theory of felony murder, the People must prove that the robbery and/or kidnapping and the act causing the death were part of one continuous transaction. The continuous transaction may occur over a period of time and in more than one location. [¶] In deciding whether the act causing the death and the felony were part of one continuous transaction, you may consider the following factors: [¶] 1. Whether the felony and the fatal act occurred at the same place; [¶] 2. The time period, if any, between the felony and the fatal act; [¶] 3. Whether the fatal act was committed for the purpose of aiding the commission of the felony or escape after the felony; [¶] 4. Whether the fatal act occurred after the felony but while one or more of the perpetrators continued to exercise control over the person who was the target of the felony; [¶] 5. Whether the fatal act occurred while the perpetrators were fleeing from the scene of the felony or otherwise trying to prevent the discovery or reporting of the crime; [¶] 6. Whether the felony was the direct cause of the death; [¶] AND [¶] 7. Whether the death was a natural and probable consequence of the felony. [¶] It is not required that the People prove any one of these factors or any particular combination of these factors. The factors are given to assist you in deciding whether the fatal act and the felony were part of one continuous transaction."

evidence was offered that he had reached a place of safety, and therefore completed the robbery, either before he and Clamp left the house with Sorokin or at least before Sorokin was killed. Skuba points to the significant period of time that elapsed between the robbery and the homicide (under the prosecution's theory of the case) in which he not only did his laundry, talked with Roberts and Junior, and waited for Clamp to arrive, but he also drove around the Santa Cruz mountains for at least an hour with Clamp and Sorokin. Skuba also argues that he had reached a place of temporary safety before Sorokin was killed because there was no direct evidence that he was trying to escape from the robbery when Sorokin was thrown from a cliff. We reject Skuba's claim because the facts of this case do not warrant any rendition of the escape instruction.

We disagree with Skuba's argument that *Wilkins*, *supra*, 56 Cal.4th 333 and *People v. Ford* (1966) 65 Cal.2d 41 (*Ford*) support the application of the escape instruction in this case. In *Ford*, the defendant robbed and kidnapped a victim, then kidnapped his wife and children and drove around aimlessly for hours with his family and the robbery victim in tow, before shooting a police officer who pulled him over. (*Id*., at pp. 47-48.) *Ford* held that the robbery terminated before the homicide. (*Id.* at p. 56.) The court considered the approximate four-hour time lapse between the robbery and the shooting and the evidence showing that the defendant was not endeavoring to escape the robbery when he shot the police officer. (*Id*., at pp. 56-57.) The court also considered that the officer's pursuit was unrelated to the robbery and that the robbery did not motivate the officer's conduct. (*Id*., at p. 57.)

It is unclear how *Ford* supports Skuba's argument that he escaped from the robbery *before* he left his residence with Clamp and Sorokin. In any event, *Ford* is distinguishable because the victim there, a police officer, was not the robbery victim. Nor was the officer's pursuit related to or motivated by the robbery. Most significantly, the excursion in *Ford* was not a trip to dispose of a seriously injured robbery victim as in the instant case.

In *Wilkins*, the prosecution offered evidence that the defendant drove at least 60 miles from a housing construction site where he stole appliances, when one of the appliances fell from the bed of his pickup truck causing a fatal accident to a motorist. (*Wilkins*, *supra*, 56 Cal.4th at pp. 338-340.)  The trial court refused the defendant's request for the escape instruction, relying on the instruction's bench note which stated generally that the instruction " 'should not be given in a felony-murder case to explain the required temporal connection between the felony and the killing . . . .' " (*Id.*, at p. 341, quoting Judicial Council of Cal., Crim. Jury Instns. (2012) Bench Notes to CALCRIM No. 3261, p. 990.)  *Wilkins* explained that the bench note drafters rendered misleading guidance by relying on language in *People v. Cavitt* (2004) 33 Cal.4th 187 (*Cavitt*), which involved the application of the escape rule in the context of felony-murder accomplice liability.  (*Wilkins*, *supra*, at p. 342.)[4]  Thus, a discussion of *Cavitt* is warranted to understand the full import of *Wilkins*.

In *Cavitt*, the third accomplice in a burglary/robbery killed the victim after co-defendants left the scene of the crime and arguably reached a place of temporary safety. One of the co-defendants requested burglary and robbery escape instructions, which were given with an additional concluding paragraph:  " 'The perpetrators have not reached a place of temporary safety if, having committed the robbery [or burglary] with other perpetrators, any one of the perpetrators continues to exercise control over the victim. Only when all perpetrators have relinquished control over the victim[,] are in

---

[4] *Wilkins* referenced the following language from *Cavitt*, which apparently resulted in the misleading CALCRIM bench note:  " 'The "escape rule" defines the duration of the underlying felony, in the context of certain ancillary consequences of the felony [citation], by deeming the felony to continue until the felon has reached a place of temporary safety.  [Citation.]  The continuous-transaction doctrine, on the other hand, defines the duration of felony-murder liability, which may extend beyond the termination of the felony itself, provided that the felony and the act resulting in death constitute one continuous transaction.' " (*Wilkins*, *supra*, 56 Cal.4th at p. 342, quoting *Cavitt*, *supra*, 33 Cal.4th at p. 208.)

unchallenged possession of the stolen property[,] and have effected an escape can it be said that any one of them has reached a place of temporary safety.' " (*Cavitt*, *supra*, 33 Cal.4th at p. 208.) The co-defendant in *Cavitt* argued that the additional paragraph-instructing that all perpetrators must reach a place of temporary safety before any of them are deemed to do so-was a misstatement of the law. (*Ibid*.)

*Cavitt* concluded that the continuous transaction instruction alone was proper and sufficient since the victim remained under the accomplice's control at the time of the homicide. (*Cavitt*, *supra*, 33 Cal.4th at pp. 208-209.) *Cavitt* further concluded that the escape instruction in its entirety was unnecessary but harmless because it did not provide an impermissible route to conviction. (*Id*. at p. 209.) Thus, while *Cavitt* noted support for the concept that a felony continues under the escape rule as long as one of the perpetrators retains control over the victim or is in flight from the crime scene, it fell short of announcing such a rule by concluding instead that the escape instruction was unnecessary. (*Ibid*.)

*Wilkins* accepted the conclusion in *Cavitt* that the escape instruction was unnecessary when a victim remains under the control of and is killed by an accomplice after the defendant leaves the scene of a burglary, but distinguished *Cavitt* as addressing "the scope of accomplice liability in connection with the felony-murder rule." (*Wilkins*, *supra,* 56 Cal.4th at p. 342.) *Wilkins* clarified that the rule in *Cavitt* does not stand for the proposition that the escape instruction is inapplicable in cases where the complicity aspect of the felony murder rule is not at issue. (*Ibid*.) In cases involving a single perpetrator, *Wilkins* reaffirmed the general rule that an underlying felony and a subsequent killing cannot be considered one continuous transaction when the sole perpetrator flees the scene of the crime and reaches a place of safety before the killing occurs. (*Id*., at p. 344.) Under that basic scenario, an escape instruction is needed "to test the sufficiency of the evidence that a killing occurred in the commission of a felony." (*Ibid*.)

In addition to addressing *Cavitt*, *Wilkins* also noted cases limiting application of the escape rule. Citing to *People v. Fields* (1983) 35 Cal.3d 329, 364-367 (*Fields*), and *People v. Carroll* (1970) 1 Cal.3d 581, 584 (*Carroll*), *Wilkins* recognized that the escape rule does not apply when a homicide occurs as part of the same transaction as a felony but before the perpetrator attempts to flee. (*Wilkins*, *supra*, 56 Cal.4th at p. 345.) In *Fields*, *supra*, 35 Cal.3d at pp. 336-337, the victim was robbed in the defendant's residence. The court held that the residence was not a place of safety so long as the victim was held prisoner there. (*Id.*, at p. 367.) And in *Carroll, supra,* 1 Cal.3d at p. 583, the defendant, after robbing the victim in the bathroom of a bar, followed the victim to the bar where he shot and seriously wounded the victim. *Carroll* held that the robber had not won a place of temporary safety by leaving the bathroom, noting that the defendant's purpose in leaving the bathroom was to pursue the victim. (*Id.*, at p. 585.) (Accord *People v. Powell* (1974) 40 Cal.App.3d 107, 164 [robbers did not reach place of safety with robbery victim in car].) In this vein, the Attorney General argues that the facts of this case do not show flight from the robbery, much less a completed flight. We agree with the Attorney General. Under *Fields* and *Carroll*, no flight occurred between the robbery and Sorokin's death.

Skuba argues that *Fields* is distinguishable because the victim there possibly could have escaped and notified the police, rendering the defendant's residence unsafe. In contrast, because Sorokin was not conscious and could not summon help, Skuba asserts that the general rule in *Wilkins* should apply. We disagree, and we reject Skuba's assertion that the degree of injury initially inflicted upon Sorokin could serve as a basis for determining the scope of Skuba's felony-murder liability.

Notably, *Fields* went on to explain that a successful escape would require the defendant to either dispose of the victim or to flee to some other place. (*Fields*, *supra*, 35 Cal.3d at p. 368.) We reject any implication that rendering a victim unconscious amounts to the disposal of a victim under *Fields*. The fact remains that Skuba never executed an

escape. He never fled, and the absence of evidence of flight is not evidence that an escape was effectuated and the robbery concluded. Under *Fields*, as long as Skuba was in control of Sorokin, he could not flee, much less reach a place of temporary safety.

Finally, we reject Skuba's argument, in an effort to distinguish *People v. Ramirez* (1995) 39 Cal.App.4th 1369, that Skuba was entitled to the escape instruction because the prosecutor failed to present evidence that Sorokin was under Skuba's control after the departure from the Felix Street residence with Skuba and Clamp. In *Ramirez*, the defendant robbed the victim in a convenience store parking lot. (*Id.*, at p. 1373.) While trying to leave the parking lot quickly after the robbery, the victim stalled his car and was again approached and stabbed by the defendant. (*Id.*, at p. 1374.) The court noted that the defendant could not have reached a place of temporary safety so long as the victim remained under his control, and concluded further that the robbery was not over until the *victim* reached a place of temporary safety. (*Id.*, at p. 1375.)

Here, the evidence is undisputed that Sorokin never reached a place of temporary safety but instead remained under the control of Skuba and/or Clamp until he was thrown from a cliff. Under the prosecution's version of events, with Skuba present when Sorokin was thrown from a cliff, *Ramirez* would preclude an escape instruction because Sorokin remained under Skuba's control. And under the version of events with Skuba waiting alone in Clamp's truck while Clamp disposed of Sorokin, an escape instruction would be unnecessary under *Cavitt* because, with Sorokin under the control of Clamp, any escape efforts by Skuba would be irrelevant. (*Cavitt*, *supra*, 33 Cal.4th at p. 209.)

In sum, Skuba was not entitled to an escape instruction in any form because Sorokin was under Skuba's control, or the control of Clamp, until he was killed. Skuba's outing was a callous trip to dispose of Sorokin, not an escape from the scene of the robbery. The trial court committed no error by not instructing the jury with any aspect of the escape instruction. Because we find no error, we do not address Skuba's arguments regarding prejudice and ineffective assistance of counsel.

## 2. The Trial Court was not Required to Define "Logical Connection" in CALCRIM 540B or 540C

The trial court instructed the jury with felony murder instructions CALCRIM 540B and 540C. Both instructions require "a logical connection between the cause of death and the robbery." Both also require "[t]he connection between the cause of death and the robbery [to] involve more than just their occurrence at the same place and time." Skuba argues that the trial court erred by failing sua sponte to define the term "logical connection" in instruction 540C.[5] According to Skuba, "logical connection" does not have plain, unambiguous meaning. Thus, without defining "logical connection," the jury could have convicted Skuba of felony murder by finding that the homicide was committed "in connection with the felony," and not "in the perpetration of the felony" as provided in Penal Code section 189. Skuba persists that the trial court's failure to instruct on the meaning of "logical connection" effectively changed the statutory elements of felony murder, thereby violating the separation of powers doctrine and Skuba's due process rights.

We agree with the Attorney General that no clarification of the relationship between the robbery and murder of Sorokin is needed because the evidence does not raise an issue as to the logical nexus between the two crimes. *Cavitt*, *supra*, 33 Cal.4th 187 is controlling. In *Cavitt*, the victim of a robbery died of asphyxiation after robbers beat her and wrapped her in a sheet with rope and duct tape. (*Id*., at p. 193.) In rejecting the defendant's contention that the trial court erred by failing sua sponte to clarify the logical nexus requirement, *Cavitt* explained that no sua sponte duty to clarify the relationship

---

[5] Although Skuba argues that the "logical connection" language in CALCRIM 540C required clarification, his opening brief cites to the trial court's reading of CALCRIM 540B. The Attorney General also miscites CALCRIM 540B as CALCRIM 540C. Both instructions contain the "logical connection" language and our analysis applies to both.

between the felony and the homicide exists without an evidentiary basis for the clarification. (*Id.*, at p. 204.) The *Cavitt* court noted: "It is difficult to imagine how such an issue could ever arise when the target of the felony was intentionally murdered by one of the perpetrators of the felony." (*Id.*, at p. 204, fn. 5.) Here, not only was Sorokin the intended target of a robbery, he was killed precisely because of his status as the victim of the robbery. Accordingly, we find no evidentiary basis requiring clarification of the relationship between the robbery and murder of Sorokin, and we reject Skuba's argument that the court erred by failing to define the term "logical connection."

## C.     THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY EXCLUDING IMPEACHMENT EVIDENCE OF ROBERTS

The trial court denied Skuba's motion to impeach Roberts with evidence that she lied about her identity to police officers. The court allowed Skuba to impeach Roberts with a 2009 forgery conviction and the 2010 robbery conviction in this case, but it would not allow Roberts to be impeached with evidence that she gave Monterey County Sheriff deputies her sister's name during a traffic stop in November 2009. Skuba argues that, unlike the other impeachment evidence, this evidence went to the heart of Roberts' credibility as a witness.

The court excluded the impeachment evidence under Evidence Code section 352 and commented that the robbery conviction would be more probative. We review the trial court's exclusion of impeachment evidence under Evidence Code section 352 for an abuse of discretion. (*People v. Valdez* (2004) 32 Cal.4th 73, 108.)

Skuba contends further that the trial court's exclusion of this impeachment evidence violated his right to confront a witness against him under the Sixth Amendment. A confrontation clause violation requires a showing that " 'the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility." ' " (*People v. Chatman* (2006) 38 Cal.4th 344, 372.)

Citing to *People v. Randle* (1982) 130 Cal.App.3d 286 (*Randle*), Skuba argues that robbery does not bear directly on a witness's veracity in the way that lying to the police does. In *Randle*, the court held that the trial court's denial of a motion for a new trial based on newly discovered evidence was error. (*Id*., at p. 294.) There, the defendant was found guilty of forcible oral copulation, and newly discovered evidence, including specific instances of conduct, showed the victim's reputation for soliciting public sex acts in exchange for money, drugs and drinks, and for dishonesty and theft. (*Id*., at pp. 289, 292.)

In concluding that the newly discovered evidence warranted a new trial, *Randle* noted that the evidence was not merely cumulative. (*Randle*, *supra*,130 Cal.App.3d at p. 293.) Since the defendant was unaware of the victim's background, he made no substantial effort to impeach her at trial. (*Id.*, at pp. 293-294.) *Randle* noted the Attorney General's concession that evidence of the victim's reputation for untruthfulness would be admissible on retrial. The court further commented that evidence of the victim's reputation for theft might be admissible on retrial under Evidence Code section 352 as being probative of dishonesty and lack of credibility but dissimilar to the conduct at issue. (*Id*., at p. 294.) We do not read *Randle* as meaningfully distinguishing between prior acts of lying and thieving under Evidence Code section 352. *Randle* was acknowledging a concession by the Attorney General pertaining to the particular facts in that case. The court was not suggesting that Evidence Code section 352 does not govern the admissibility of specific instances of a witness's untruthfulness.

Skuba argues further that by omitting evidence that Roberts lied to the police, she presented a "false aura of veracity" to the jury. (*People v. Beagle* (1972) 6 Cal.3d 441, 453 [in acknowledging the general rule that felony convictions bearing on veracity are admissible, noting that "[n]o witness . . . is entitled to a false aura of veracity."].) We disagree. As the Attorney General points out, Roberts was presented as an accomplice to

the robbery in this case. She had pleaded guilty to the robbery, and as a condition of her plea agreement, she promised to testify truthfully.

The jury heard evidence that Roberts was abusing alcohol and methamphetamine in July 2009. Indeed, the prosecutor admitted in closing argument that Roberts' memory was compromised by alcohol abuse. Evidence was also presented that Roberts looked for something to steal from Sorokin's truck, offered Sorokin's credit card to Senior, and tried to purchase personal items from Target using one of Sorokin's credit cards. She also admitted to a felony forgery conviction-cashing forged checks stolen from Skuba's housemate, including one for about $750-and a conviction for drunk driving involving an injury. She testified that she lied to the police during her initial questioning regarding her involvement in the robbery. For example, Roberts initially told police she saw Skuba move Sorokin from the garage to the bed of the pick-up truck. But she retracted that statement at trial, explaining she could not see the front of the garage or the pick-up truck from her position on the balcony, but only heard sounds of Sorokin's body being moved from the garage to the truck.

Given the extent of Roberts' testimony on these subjects, we reject Skuba's assertions that her testimony presented a false aura of veracity to the jury. We further reject Skuba's argument that the omitted evidence would have established a pattern of dishonesty and would have left the jury with a different impression of Roberts' credibility. (*Chatman*, *supra*, 38 Cal.4th at p. 372.) Thus, no confrontation clause violation resulted, nor did the trial court abuse its discretion, by excluding evidence that Roberts falsely identified herself to police in November 2009.

Finally, we agree with the Attorney General that even assuming the trial court abused its discretion by excluding evidence of Roberts' contact with Sheriff's deputies, no prejudice resulted. We recognize that Roberts was the only witness who testified regarding Skuba's plan to "jack" someone for marijuana and Skuba's statement to her that Sorokin was thrown over a cliff. But the jury had to do more than disbelieve Roberts

to find Skuba not guilty of felony murder.  The jury would also have to disbelieve Senior, Junior, and Wentzel, and believe Skuba's uncorroborated version of events.  While the prosecution's witnesses did not testify consistently regarding every detail surrounding the evening in question, Roberts, Senior, Junior and Wentzel testified consistently to Skuba's involvement in the robbery, and Roberts, Senior and Junior testified as to Skuba possessing the spoils of the robbery.  Further, while Roberts was the only witness to Skuba's statement that Sorokin was "knocked out" in the garage, it is undisputed that Sorokin was in the garage, either severely incapacitated or-under Skuba's version of the events-already dead.  Either way, Skuba would be guilty of felony murder.  Given the overwhelming evidence of Skuba's participation in the robbery and murder of Sorokin, it is not reasonably probable that a more favorable result would have occurred had the jury heard that Roberts lied to police about her identity during a traffic stop in November 2009.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

## DISPOSITION

The judgment is affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Rushing, P.J.

_____

Márquez, J.