Filed 2/6/14  P. v. Reed CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br> v.<br><br> ANTOINE D. REED,<br><br>  Defendant and Appellant. | B243043<br><br> (Los Angeles County<br> Super. Ct. No. YA067500) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  James Brandlin, Judge.  Affirmed.

Laura G. Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen and Jonathan M. Krauss, Deputy Attorneys General, for Plaintiff and Respondent.

_____

This is defendant Reed's third appeal from his convictions of one count of rape, one count of oral copulation with a person under age 16 and two counts of lewd conduct with a person age 14 or 15. We affirm the judgment.

## FACTS AND PROCEEDINGS

### A. Proceedings

In *Reed I* (*People v. Reed* (Mar. 4, 2009, B206326) [nonpub. opn.]) we held that the trial court erroneously refused to allow Reed to call the victim's mother as a witness. We conditionally reversed the judgment and remanded the cause with directions to give Reed an opportunity to present "all relevant testimony mother has to offer" and thereafter to determine whether her testimony warrants a new trial.

After hearing the mother's testimony, the court denied Reed's motion for a new trial and reinstated his three strikes sentence of 110 years to life. Reed filed a timely appeal from the reinstated judgment. In *Reed II* (*People v. Reed* (Dec. 15, 2010, B221330) [nonpub. opn.]), we reversed the judgment and remanded the matter to the trial court once again because the court prevented Reed from seeking evidence from the victim's mother on relevant topics. Our disposition directed the trial court "to hold a de novo hearing at which Reed may question mother on any relevant issue regardless of whether the subject was covered at the previous hearing."

Upon remand, the court heard the mother's testimony and the testimony of police officers and school officials. The court excluded an "incident report" prepared by the school principal shortly after the victim reported the alleged crimes and quashed Reed's subpoena for the victim's school records. Following the hearing, the court once more denied Reed's motion for a new trial and reinstated the judgment. Reed filed this appeal from the reinstated judgment.

We conclude that Reed failed to show it was reasonably probable that the mother's testimony, the testimony of the other witnesses and the admission of the school "incident report" and attendance records would have resulted in an outcome more favorable to him.

## B.    Trial Evidence

The prosecution's evidence showed that Reed approached 15-year-old S. between 7:00 and 8:00 in the morning of August 2, 2006, as she waited at a bus stop to go to school. Reed told S. that he was a "modeling agent" and asked her to walk over to his car to look at photographs and his camera. S. agreed. At the car, Reed showed S. a document that he said was his "modeling agent" license, his camera and an album of photographs of young women. Reed told S. that he would pay her $200 if she would go with him to model for some photographs. Believing that she was going to earn $200 for modeling, S. agreed to go with Reed. During the drive to the Botanic Garden in Palos Verdes, S. told Reed that she was 15 years old and Reed told her that he had daughters close to her age.

In a secluded area of the Botanic Garden, Reed raped S., placed his penis in her mouth and forced her to masturbate him. Afterward Reed dropped S. off at her high school. As he drove away, S. wrote down the license number of his car.

Initially S. told police that Reed had "picked her up" and "thrown her into the car." Later she told police that Reed had threatened to "use a knife on her" if she did not get into his car. Still later, S. admitted to police that these versions were untrue and at trial she testified to the version of events described above. On cross-examination she admitted that she had initially lied to the police.

Reed testified in his own defense. He stated that S. approached him and expressed interest in being a model. She agreed to go to the Botanic Garden with him to pose for pictures in return for $20 and a copy of the prints to use in her modeling portfolio. S. told Reed that she was 19 years old and he believed her. At the Garden, Reed photographed S. as agreed. After the photo session ended, they argued over the amount Reed had agreed to pay S. for her modeling; Reed claiming it was $20 and S. claiming it was $200. In the course of their argument Reed remarked that S. would "have to do a little bit more than that for $200" and S. replied "let it do what it do." Taking that reply as a consent to engage in sex, and believing S. to be 19, Reed found a "nice spot," engaged in vaginal

3

intercourse with her and ejaculated on her face and neck. Reed denied forcing S. to touch his penis and denied putting his penis in her mouth or putting his mouth on her breast.

Reed proposed calling S.'s mother as a defense witness to testify whether the police had "manipulate[ed]" S.'s testimony. Although he conceded that he did not know what the mother would say and was not able to make an offer of proof of her testimony because she had refused to talk to his investigator, he did explain: "She had a[n] inclination to not allow Detective Montenegro to talk to her daughter because she felt like they were manipulating her daughter." The court, however, refused Reed's request to call the mother as a witness stating "this isn't the time for depositions" and that Reed's "hope that she's going to be able to provide relevant information" was not enough of a showing to allow her testimony.

## C.    Evidence At The First Remand

Upon Reed's appeal from the judgment we held that the court abused its discretion in excluding the mother's testimony because the record supported the likelihood that the mother could give material testimony and the court's requirement that Reed demonstrate how the mother would testify "imposed an insurmountable burden on the defense." Because we could not determine whether the exclusion of the mother's testimony was prejudicial, we conditionally reversed the judgment and remanded the case to the trial court to hear the mother's testimony and determine whether it required granting Reed a new trial. We specifically directed the trial court not to limit the mother's testimony to the "manipulation" issue but to "hear all relevant testimony mother has to offer." We further directed that after the court heard all of the mother's relevant testimony it "shall evaluate the materiality of this new evidence in light of the whole record and determine whether to grant Reed a new trial."

Upon remand, the court held a hearing at which S.'s mother was questioned by Reed, again appearing in pro per, and the prosecutor.

The mother testified that she received telephone calls from S.'s grandmother and the police informing her that S. had been raped and was at the police station. When she

4

arrived at the station she saw S. and hugged her. The police did not allow her to be present when they interviewed S. The mother stated that she was angry at being excluded from the interview and came away with the impression that female officers at the police station had been rough, mean and rude toward S. That was why, she explained, she was initially reluctant to allow Detective Montenegro to come to the house to speak further with S. Once she realized that Montenegro was not one of the officers who had behaved in a manner she disapproved, she allowed Montenegro to come and interview S. The mother testified that in the days following the alleged rape, S. told her, in bits and pieces, a version of what happened that was fairly close to her testimony at trial.

The mother further testified that she did not believe S. was a liar, S. had never been in trouble for ditching classes, she was a "model student" who received "straight A's" and that S. had never had any problems in school.

Following the hearing the court denied Reed's motion for a new trial and reinstated the judgment.

### D.    Evidence At The Second Remand

We again reversed the judgment because the court prevented Reed from seeking evidence from S.'s mother on relevant topics. The court would not allow Reed to question the mother about the kinds of discipline she inflicted on S. prior to the incident in order to show S. lied about the incident out of fear of her mother's retribution. The court would not allow Reed to question the mother about where S. got the money to pay for her cell phone in order to show that S. needed money for the phone. Finally, the court would not allow Reed to question the mother about whether she fed S. every day. The relevancy of this last inquiry arose from the testimony of one of S.'s teachers that he frequently gave S. food money because she was having a "hard time at school." Reed reasoned that if S's mother fed her at home, her asking for food money at school showed she would "trick adults out of their money."

On the second remand, S.'s mother gave the following testimony.

5

The mother stated that when she testified at the evidentiary hearing after the first remand she did not testify falsely to protect S. nor did she ever lie to any law enforcement officials to protect S.  Her mother testified that S. has lied to her in the past but Reed did not ask, and her mother did not give details of what S. lied about.  She did say that she could tell whether or not S. is lying but she was not asked if she believed S. was telling the truth in stating that Reed raped her.

If S. misbehaved, her mother punished her by depriving her of privileges such as taking away her computer.  She never used physical discipline on S.

On the issue of where S. got the money for her cell phone and food, her mother testified that S. performed chores around the house, and as a reward she received allowances and privileges, such as owning her own cell phone.  The mother bought time on S.'s phone for her and could not recall any times when S.'s phone time ran out and she needed more money.  Her mother tried "to keep her phone bill paid."  At the time of the incident, the mother received Social Security and public financial assistance; however, she did not acquire money "in other ways" to "make ends meet."  Her children's father worked.  Between his income, upon which the mother "didn't rely," her Social Security income and public assistance she was able to pay her rent.  She did not describe her "economical situation" as "hard times." Instead, she said things were "all right," and that "up until the point of the rape . . . it wasn't that bad."  When S. needed clothing and other items, her mother, along with S.'s father, grandmothers, and aunt, would contribute money.

The mother testified that when she arrived at the police station, she saw S. and gave her a hug.  At that point, two officers called S. into another room.  The police told the mother that she could not join her daughter.  S. told her mother that she wanted to speak with her, but she never said that she wanted to speak with her mother privately, and she never asked to leave the station.  The mother saw that S. was "sad" and that "[s]omething was wrong."  While she was at the station, the mother did not recall seeing the officers provide S. with any food or drink, and she did not recall seeing S. use the

6

bathroom in the seven to nine hours she was being questioned by the police. Her mother later clarified on cross-examination that she did not know whether S. used the bathroom before she got there, only that when she arrived, S. needed to use the bathroom. When S. left the room she was "upset" and she told her mother "how they were speaking to her." The mother admitted that she had previously accused the police of "badgering" her daughter during the interview.

When asked if she allowed S. to "hang out" alone with her boyfriend, her mother answered, "No." (This conflicted with S.'s testimony at trial that she did not have a boyfriend.)

After hearing the mother's testimony the court permitted Reed to call certain "'impeachment' witnesses" to counter her testimony.

Vince Carbino, the principal of S.'s school, testified that he prepared an incident report concerning the alleged attack on S. and that he obtained the information he used in the report from Alan Tuazon, a clinical social worker employed by the school district. Tuazon obtained his information by sitting in on a meeting between the school nurse, the police and S. The incident report describes the incident as a "possible rape" and the suspect as a "Black Male Teenager or Early Adult." It also states: "During police questioning, student changed story to she had been with her boyfriend from Dorsey High School all day."[1] It is undisputed that her mother was never involved in these conversations and that she did not receive a copy of the incident report.

The court also heard testimony that nearly four years after the alleged sexual assault S.'s mother was arrested for violating Penal Code section 244, assault with a caustic chemical (bleach). The alleged victim was a 5-year-old child. The case was ultimately rejected for filing by the District Attorney and the Los Angeles City Attorney.

---

[1]    It does not appear that the incident report was offered into evidence at the hearing and the court refused to allow Reed to call the social worker, Tuazon, as a witness. The report is included in the record as an attachment to Reed's motion for a new trial made after the hearing.

Reed attempted to subpoena S.'s school records for the period 2003-2007 including her report cards, attendance records, disciplinary reports and all reports prepared by school officials regarding the alleged sexual assault. The attorney representing S. at the hearing moved to quash the subpoena and the court granted the motion on the grounds the records were outside the scope of our remand, Reed failed to establish good cause for the production of the records and this collateral attempt to impeach the mother violated S.'s right to privacy and to be free from harassment.

After hearing the testimony described above the court denied Reed's motion for a new trial. The court found that Reed failed "to establish any reasonable probability that a more favorable outcome would have occurred even if the jury had heard the testimony of S.'s mother and the additional "'impeachment' witnesses." In accordance with our instructions, the court reinstated the judgment. Reed filed a timely appeal.

## DISCUSSION

### I. THE STANDARD OF REVIEW

A defendant may obtain a new trial based on newly discovered evidence. (Pen. Code, § 1181, subd. 8.) "To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial." (*People v. Ochoa* (1998) 19 Cal.4th 353, 473.) When, as here, the core of the case is whether the sex acts occurred with consent or force and the newly discovered evidence goes to the credibility of the victim who is the prosecution's sole percipient witness the evidence must do more than merely impeach that witness. (*People v. Huskins* (1966) 245 Cal.App.2d 859, 862 ["Ordinarily, evidence which merely impeaches a witness is not significant enough to make a different result probable"].) It must tend "to destroy her testimony by raising grave doubts about her veracity and credibility." (*People v. Randle* (1982) 130 Cal.App.3d 286, 293.)

The trial court exercises "broad discretion in ruling on a new trial motion," and its "ruling will be disturbed only for clear abuse of that discretion." (*People v. Ault* (2004) 33 Cal.4th 1250, 1260.)

8

## II. THE NEW EVIDENCE REED PRODUCED DOES NOT SIGNIFICANTLY AFFECT S.'S CREDIBILITY.

We will assume for the sake of argument that in a new trial, S.'s mother and the other witnesses would testify as they did at the remand hearings, that the school's "incident report" would be admitted into evidence and that the school records would show that S. was a frequent truant. None of that evidence, whether viewed separately or together, raises "grave doubts about [S.'s] veracity and credibility." (*People v. Randle*, *supra*, 130 Cal.App.3d at p. 293.)

The principal areas Reed wished to question S.'s mother about—the mother's discipline of S., how S. paid for her cell phone, and whether the mother fed S. every day—were allowed at the second remand and produced no evidence that would significantly aid Reed's defense that S. had sex with him for money. The mother testified that if she needed to discipline S. she did so by taking away her computer, never by whipping or hitting her. S. obtained money for her cell phone from her mother by doing chores around the house. The mother was not directly asked and did not directly testify that she fed S. every day. She did comment that she had difficulty making "ends meet" but did not describe her family's financial circumstances as "hard times."

Beyond those primary areas of inquiry, the mother's testimony contradicting S.'s claim that she did not have a boyfriend and her admission that at sometime in S.'s life she lied to her mother on some unknown topic is unlikely to give a jury "grave doubts" about S.'s credibility. Even if school records showed that S. was an habitual truant, that fact would not allow a jury to "logically and reasonably" infer that while she was not at school she was engaged in prostitution or at least in consensual sex. (Evid. Code, § 600, subd. (b).) The bleach-throwing incident was too remote to permit an inference that her mother had a hot temper and would have severely punished S. if she knew that S. had willingly engaged in sex acts with Reed.

Reed argues that evidence of prolonged police questioning of S. without parental contact, food, water or use of a restroom would cause a jury to be skeptical of S.'s story

9

especially since she told Detective Montenegro that "the [police] had changed her story." That argument fails for several reasons.

The mother did not hear the police interview with S. and there was no other evidence as to what was said. She did testify that after the interview she had the impression from talking to S. that the police had "badgered" her daughter but her mother did not give any details as to what this "badgering" entailed.

Furthermore, the jury in the original trial heard evidence that the police had "changed" S.'s story. Since that evidence did not lead the original jury to doubt S.'s credibility, evidence about the protracted interview at the police station is not likely to have that effect in a retrial.

Finally, it does not logically follow that because the police interviewed S. at length and "changed" her story that they changed it from the truth to a lie. It is undisputed that S. lied to the police from the outset, first stating that Reed had "thrown" her into his car then later stating that Reed had forced her into his car at knife point. If the school "incident report" was admitted in evidence it would show that S. told two other lies when she first reported the incident to the police and the school. She initially said she was raped by a "black teenager" then, in the same interview, she said she wasn't raped at all but had spent the day with her boyfriend who attended a different school. It is doubtful that a jury looking at this evidence would conclude, as Reed claimed, that S. was a high school hooker and that she cried rape to get even with him in a dispute over money. It is more likely that a jury would believe S.'s admission to Detective Montenegro that her lies were born out of embarrassment at her lack of common sense in going off with a middle-aged adult male she did not know, in his car, by herself, to a secluded location, to "model" for photographs.

For the reasons explained above, the court did not abuse its discretion in denying Reed's motion for a new trial nor is it necessary to remand the matter for a further evidentiary hearing.

10

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.


                                  ROTHSCHILD, Acting P. J.

We concur:


JOHNSON, J.


MILLER, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.